THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 2:24-cr-38 |
| ANTWAN HUE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### THE UNITED STATES' RESPONSE TO DEFENDANT'S POSITION ON THE SCOPE OF SUPPRESSION (ECF 221)

Defendant Antwan Hue seeks to suppress broad categories of evidence that law-enforcement officers obtained in the months and years following a 2017 traffic stop in South Carolina. ECF 221. The government does not intend to offer in its case in chief 1) any evidence gathered at the traffic stop, 2) any "fruits" of that evidence, and 3) in an abundance of caution, several other categories of evidence described below. The decision to not offer these items renders moot any motion to suppress them.

However, suppression of evidence beyond that scope is unwarranted. Each disputed category of evidence discussed below is admissible because it is not "fruits" of the traffic stop, or it is subject to one of the many well-established exceptions to the exclusionary rule, including attenuation, inevitable discovery, independent source, and good faith.

The government has described the factual background of this case in its original opposition to defendant's motion to suppress. *See* ECF 152 at 1–10. In short, defendant operated an international drug-trafficking organization, and he hired people to murder the mother of one of his children so that he could more easily continue his drug-trafficking activities. Multiple law-

1

enforcement agencies conducted lengthy investigations to determine who was responsible for this murder, and still others investigated defendant's drug-trafficking activities. The investigations involved multiple search warrants, subpoenas, and witness interviews. We provide additional information relevant to each contested warrant below.

In May 2024, a federal grand jury indicted defendant for murder for hire, drug trafficking, and other offenses. ECF 3. In September 2024, defendant moved to suppress the evidence obtained from the 2017 South Carolina stop, arguing that the officer unlawfully extended the stop. ECF 110. The government initially opposed, ECF 152, but later filed a notice that it would not seek to use such evidence or its fruits in its case in chief, ECF 193. This Court ordered supplemental briefing on the full scope of evidence to be suppressed. ECF 195.

### Discussion

### I.    Applicable Legal Principles

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

"When law enforcement officials have violated [the Fourth Amendment] by unreasonably intruding on one or more of these protected spheres of privacy, the evidence gained as a result of that intrusion may, in appropriate cases, be ruled inadmissible at a subsequent criminal trial." *United States v. Clark*, 891 F.2d 501, 505 (4th Cir. 1989). The government's concession that it will not attempt to introduce in its case in chief evidence that a defendant has sought to suppress moots that motion. *See, e.g.*, *United States v. Neville*, No. 3:24-cr-183, 2025 WL 2696992, at *1 n.1 (E.D. Va. Sept. 22, 2025) (Novak, J.) (noting that "[b]ased on the Government's representation that it will not seek to introduce or use any of these statements at trial, the Court

2

denied Defendant's *Miranda* Motion as moot") (citations omitted); *United States v. Shah*, No. 5:13-cr-328, 2015 WL 72118, at *1 (E.D.N.C. Jan. 6, 2015) ("the government responds to defendant's motion seeking suppression of evidence generated during his arrest that it will not attempt to offer into evidence any of the statements or conduct discussed in defendant's motion to suppress on Fifth Amendment grounds, rendering that motion moot").

For the evidence the government does intend to introduce, "[s]uppression of evidence . . . has always been [a] last resort, not [a] first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). "Even when a [F]ourth [A]mendment violation has concededly occurred, evidence challenged on a suppression motion will not be excluded unless a causal relationship exists between that particular violation and the discovery of the evidence sought to be excluded." *Clark*, 891 F.2d at 505. Indeed, "[t]here are several doctrines under which evidence unearthed as a result of an illegal search or seizure may be admitted into evidence[]." *United States v. McKinnon*, 92 F.3d 244, 247 (4th Cir. 1996)

*First*, the Supreme Court has made clear that "but-for causality" is a necessary "condition for suppression." *Hudson*, 547 U.S. at 592; *see also Segura v. United States*, 468 U.S. 796, 804 (1984) (explaining that "the exclusionary rule reaches" "evidence obtained as a direct result of an illegal search or seizure" and evidence "found to be derivative of an illegality"). Accordingly, "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." *Hudson*, 547 U.S. at 592. Likewise, the Fourth Circuit has recognized that "a direct, unbroken chain of causation is necessary, but not sufficient to render derivative evidence inadmissible." *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2000). Instead, suppression requires "unattenuated causation." *Hudson*, 547 U.S. at 594.

3

The Supreme Court has thus held that the exclusionary rule does not apply where officers would have discovered the challenged evidence regardless of whether the preceding Fourth Amendment violation had occurred. *See Hudson*, 547 U.S. at 592 (reasoning that, whether police had illegally entered the house or not, "the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house"); *Segura*, 468 U.S. at 815 (reasoning that "[t]he illegal entry into petitioners' apartment did not contribute in any way to discovery of the evidence seized under the warrant").

*Second*, under the "attenuation doctrine," the Supreme Court has recognized that "although evidence may be obtained as a result of an illegal search, at some point the connection between the illegal conduct and the ultimately-discovered evidence 'may have become so attenuated as to dissipate the taint.'" *McKinnon*, 92 F.3d at 247 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). There is no bright-line rule to apply, *id.*; rather, courts look to 1) the "'temporal proximity' between the unconstitutional conduct and the discovery of evidence"; 2) "the presence of intervening circumstances"; and 3 "the purpose and flagrancy of the official misconduct." *Utah v. Strieff*, 579 U.S. 232, 239 (2016) (citations omitted); *see id.* (labeling the third factor "'particularly' significant").

*Third*, "the independent source doctrine . . . provides for the admissibility of evidence if it would have been obtained even absent an illegal search." *United States v. Bullard*, 645 F.3d 237, 244 (4th Cir. 2011) (citing *Murray v. United States*, 487 U.S. 533, 542 (1988)). "[T]o conclude that a later search conducted pursuant to a warrant was independent of an earlier, unlawful search, two findings must be made: first, that officers 'did not include in their application for a warrant any recitation of [their earlier unlawful observations]'; and second, that

4

they 'would have sought a warrant' even if they had not conducted the unlawful search." *Id.* (quoting *Murray*, 487 U.S. at 543) (additional citation omitted). Ultimately, the question "is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue." *Murray*, 487 U.S. at 542.

*Fourth*, evidence "is admissible pursuant to the inevitable discovery doctrine only '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Alston*, 941 F.3d 132, 137 (4th Cir. 2019) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "Inevitable discovery demands that the prosecution prove by a preponderance of the evidence: first, that police legally *could* have uncovered the evidence [by lawful means]; and second, that police *would* have done so." *Id.*

*Fifth*, the exclusionary rule does not apply to "evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *Leon*, 468 U.S. at 905. The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir. 2011).

## II.     The government does not intend to offer in its case in chief multiple categories of evidence, rendering moot any motion to suppress those items.

Defendant has proffered a list of 29 items that, he says, "[t]he parties agree . . . should be suppressed." ECF 221 at 15. A more accurate recitation of the government's position is that it does not intend to introduce these items in its case in chief, and therefore any motion to suppress those items is moot. Similarly, on further reflection, the government does not intend to introduce the following items, currently listed as disputed in defendant's position paper:

- Data on the Samsung Galaxy S4, white, #R38F70BY82A;

- Apple iPhone 6S, silver, model A1633, including data on the device;

- Jamaica National MultiLink card ending -3114;

- Chase debit ending -3110;

- ID for Chen;

- Buccal swabs from Chen;

- Jamaican passport for Hue;

- Jamaican driver's license for Hue; and

- 2x IDs for Hue.[1]

*See* ECF 221 a 15–16. Accordingly, a motion to suppress these items is similarly moot.

The remainder of the evidence defendant challenges was obtained by search warrants and subpoenas, not directly from the traffic stop. As with the above, several of these challenges are moot, as the government does not intend to introduce evidence from several warrants in its case in chief. This includes the following:

- February 13, 2017, search warrant for defendant's phone and electronics (ECF 221 at 17–18);

- March 3, 2017, Navy Federal Credit Union search warrant (*id.* at 18);

---

[1] The government still intends to offer certain photographs that law-enforcement officers took of defendant's ID cards and passport in 2019. The officers took these photos during a separate and unchallenged 2019 arrest in Florida. When that Florida case was adjudicated and the defendant was sent to federal prison, the officers returned the physical ID's and passport to defendant. Because these photographs were taken during the lawful arrest of defendant in a separate matter two years after the 2017 traffic stop, the gathering of these photos was not causally related to the 2017 traffic stop. At the very least, they are subject to the independent-source doctrine.

- March 28, 2017, search warrant for Chen's phone (*id.*);

- April 10, 2017 Google search warrant for records related to Bedessie's email address (*id.* at 19);

- April 12, 2017, Google search warrant for records related to defendant's account (*id.* at 20);

- 2019 AT&T search warrant for records related to Mercer's phone number (*id.*); and

- December 7, 2023, Meta search warrant for records related to five accounts (*id.* at 22) (2:23-sw-212).[2]

## III.  The remaining disputed warrants are not subject to suppression.

The remaining disputed warrants from which the government does intend to introduce evidence are as follows:

- March 15, 2017, T-Mobile search warrant for records related to defendant's phone number (ECF 221 at 19);

- June 29, 2023, Facebook search warrant for records related to seven accounts (*id.* at 21) (2:23-sw-123)[3];

- December 7, 2023, Google search warrant for records related to 10 accounts (*id.* at 22–23) (2:23-sw-213)[4]; and

---

[2] Also on December 7, 2023, the government obtained a search warrant to Snap, Inc. (the owners of Snapchat, a social-media service) for five accounts. 2:23-sw-211. Though defendant does not mention this warrant, the government does not intend to offer any evidence from this warrant, and so any challenge would be moot.

[3] Defendant's position paper incorrectly labels this warrant as 2:23-sw-212, *see id.* at 21 n.11; it is 2:23-sw-123. *See also id.* at 22 n.14 (correctly identifying 2:23-sw-212 as a warrant to Meta for five accounts).

[4] Also on December 7, 2023, officers obtained a different search warrant for a Facebook

- January 19, 2024, Google search warrant for records related to 10 accounts (*id.* at 23) (2:24-sw-8).

Of course, the government does not intend to introduce every item from each of these search-warrants. However, defendant broadly attacks the admissibility of each without reference to specific categories of evidence, *see* ECF 221 at 19, 21–23, so we broadly defend their admissibility. Defendant claims that the evidence from these records constitute "fruits" of the 2017 traffic stop. Even assuming the 2017 stop was unlawful, these items do not constitute "fruits" of that stop, or they are subject to one of the exceptions to the exclusionary rule described above.

### a. March 15, 2017, T-Mobile search warrant for records related to defendant's phone number

The original murder investigation was conducted by the Norfolk Homicide Division. On February 22, 2017 (approximately 10 weeks after the murder and two weeks after the February 5, 2017, traffic stop), a concerned citizen (T.C.) called into the police with information about defendant and the possibility that defendant had murdered Ryals himself. T.C. told the police that defendant was accompanied by Kayla Bedessie when he arrived at T.C.'s residence on either December 4 or December 5, 2016. Defendant said he was taking Bedessie to Atlanta, but he was

---

account associated with Steeps. *See* 2:23-sw-214. Defendant does not mention this warrant or develop any argument in support of suppressing information from it. *See* ECF 221 at 21–23. Accordingly, this response does not separately address that warrant, though the government reserves the right to respond in the future should defendant develop an argument on this evidence.

In a similar vein, defendant also does not challenge 2:24-sw-66, an April 12, 2024, search warrant to Google for information related to five accounts. The government reserves the right to respond in the future should defendant develop an argument on this evidence.

going to stop in Norfolk to see if Ryals would let him off child support.  Defendant stated words to the effect that Ryals had been holding the child support over his head, the child was not his, and he had not been paying Ryals the child support.  Defendant admitted he had spoken to a lawyer who suggested defendant talk with Ryals in an attempt to get her to go to court and have defendant's child support obligations removed.   T.C. stated he called the Norfolk Homicide Division after learning from defendant that Ryals had been killed, on what T.C. believed was the same day defendant went to see her.   T.C. gave homicide detective Cogswell three numbers that he regularly used to contact defendant, which ended in -8910, -0537 and -6223.

Two days later, on February 24, 2017, the Norfolk homicide detectives went to meet with the South Carolina police officer who had pulled over defendant and Regina Chen for speeding. The officer had uncovered cocaine and cash, and he seized that contraband, along with several other items, including a phone.  The South Carolina Officer then obtained a search warrant based on the car stop and recovered data on that phone that showed it was the same -6223 number that T.C. had given the homicide detectives days before.

Then, Detective Cogswell sought and received a search warrant for call-log and location information from T-Mobile related to the -6223 number for early-to-mid December 2016. As noted in the warrant application, Detective Cogswell had spoken with T.C., who advised that defendant 1) had been at T.C.'s residence earlier the same day Ryals was killed 2) had a child in common with Ryals and 3) was on his way to Norfolk to confront Ryals. The affidavit included that T.C. found it odd that defendant would have mentioned these facts about Ryals and she was killed later the same day. The affidavit also stated that officers recovered a phone number from defendant with the -6223 call number during his 2017 arrest on narcotics charges—i.e., the 2017

traffic stop.

The affidavit thus contained some information derived from the 2017 traffic stop. However, even if this information was tainted, suppression is not warranted. This is so because T.C. also informed Detective Cogswell, prior to his applying for the warrant, that defendant regularly contacted T.C. using three phone numbers, including the -6223 number. Accordingly, Detective Cogswell possessed the same information from an independent source prior to seeking the warrant. Detective Cogswell memorialized this information in a February 2017 report that was shown to defendant's original counsel in a pre-suppression-motion meeting, and the relevant part is attached as Exhibit A. The government believes, if called as a witness at a hearing on this motion, Detective Cogswell will testify that, even if he had not known about the 2017 traffic stop or any information related to it, he would have sought and received a warrant for the same information for the -6223 phone as well as the other two numbers T.C. provided, since he knew the telephone numbers the defendant used from this totally separate witness.

Given this anticipated testimony, the government will establish that this evidence is admissible by operation of the independent-source doctrine, the inevitable-discovery doctrine, or both. *See Bullard*, 645 F.3d at 244; *Alston*, 941 F.3d at 137.

Defendant's position paper does not grapple with this independent source of Detective Cogswell's knowledge of defendant's phone number. *See* ECF 221 at 19. His arguments—that the affidavit identified the phone number as belonging to defendant by virtue of the traffic stop and that the affidavit "relied on" statements defendant later gave during an interview—lack merit. First, the independent source of knowledge of defendant's phone number from witness T.C. means that the affidavit's reference to the 2017 traffic stop is not fatal. Second, it is

inaccurate to characterize this warrant seeking records for this phone number as "relying" on defendant's statements. The affidavit simply notes that, during the interview, defendant stated that he was in Orlando from October through December 17, 2017—approximately two weeks after the murder—and then travelled to Norfolk, Virginia, on December 17. These statements are not related to whether a murder occurred, or whether he possessed a certain phone number that was likely to reveal his location around the time of that murder. If anything, the affiant was careful to include potential exculpatory—if self-serving—information that he learned from defendant. Omitting it from the warrant would not undermine probable cause in any way.

### b. 2023 and 2024 Facebook and Google warrants

Years after the 2016 murder and 2017 traffic stop, federal officers sought and obtained multiple warrants for records related to social-media and Google accounts. The government intends to introduce evidence from three of them: 1) the June 2023 Facebook search warrant for records related to seven accounts, 2) the December 2023 Google search warrant for records related to 10 accounts, and 3) the January 2024 Google search warrant for records related to 10 accounts. Notably, of the 17 accounts (seven Facebook and 10 Google), only one account belonged to defendant.

There are two important additional pieces of context before discussing the warrant applications themselves. First, the officers caught a break in the investigation in 2019 when they received a database match to DNA left at the scene of the December 2016 murder. This match led the officers to Steeps, who was connected to Wilkes-Barre. This break prompted further investigation, development of witnesses, and additional leads that led the officers to seek the challenged social-media warrants. Naturally, this 2019 DNA his has no logical or causal

11

relationship to the 2019 traffic stop.

As part of this renewed investigative effort, in 2022, Auditor David Miller obtained a subpoena from American Airlines for travel records for Kayla Bedessie. The subpoena return revealed Bedessie's email, which was later one of the target addresses in the December 2023 Google warrant.

The affidavits in support of those warrants were exhaustive, containing much information from unchallenged sources while briefly referencing information from or arguably derived from the 2017 traffic stop. By the time the FBI adopted the case, the government was aware that *defendant's* property seized during the 2017 traffic stop, including the -6223 phone, could be suppressed. Accordingly, the FBI did not include that information in any of the successive warrant applications at issue in this case.  However, the government believed that defendant did not have standing to challenge information on *Regina Chen's* phone, and so a small amount of that information was used in a few affidavit paragraphs that were repeated in a succession of social-media warrant applications granted by a federal magistrate.  In three other paragraphs, the FBI affiant included cellsite locational data obtained by Detective Cogswell discussed above.

More specifically, Paragraphs 7 and 8 in each warrant affidavit contained information related strictly to defendant and Chen's narcotics activities derived from Chen's phone. Paragraphs 12 and 13 contained location data derived from the Norfolk's Homicide detective's warrant to T-Mobile. Paragraph 14 contained two lines line derived from Chen's phone. Paragraph 17 included information derived from Chen's phone and location data derived from Detective Cogswell's T-Mobile warrant returns.  Paragraph 30 includes information derived from Chen's phone related to narcotics activity.

The remainders of these extensive affidavits contain ample probable cause to investigate Ryals' murder having nothing to with information from the 2017 traffic stop. The three affidavits are similar in content, so we use the June 2023 warrant as an example. The probable-cause section mentions, among others, the following facts that are not derived from the traffic stop:

- Defendant had a previous romantic relationship to Ryals, the murder victim;

- Defendant had a previous domestic-violence incident against Ryals;

- A Virginia state court ordered defendant to pay child support to Ryals for their child in common;

- Defendant's U.S. passport renewal was declined due to arrearage on these child-support payments;

- Defendant was a dual U.S. and Jamaican citizen;

- Defendant travelled—two days before the murder—from New York City, then to Wilkes-Barre, Pennsylvania, then to Maryland, where Ryals lived;

- Defendant and his then-girlfriend, Bedessie, stayed with T.C. in Maryland;

- There, defendant told T.C. that he was frustrated by having to pay child support, that he thought Ryals enjoyed having power over him, and that he had spoken with a lawyer who advised him to confront Ryals and convince her to withdraw the child-support order;

- Defendant had made similar statements to Ryals's mother before the murder;

- The day before the murder, defendant's phone called a Wilkes-Barre-based telephone associated with the girlfriend of Mercer;

- Financial records from the day before the murder showed a nearly $2,000 transfer from Bedessie to an individual who lived less than a quarter mile from Mercer in Wilkes-

Barre;

- Ryals was murdered inside her home by three then-unknown individuals in front of her minor child;

- Defendant was released from his child-support order after Ryals's mother took custody of the minor child and, in October 2018, defendant renewed his U.S. passport;

- In June 2019, a DNA hit linked Zquan Steeps, of Wilkes-Barre, to the murder scene, though state authorities ultimately dismissed the murder charges against him;

- In August 2019, federal agents arrested defendant in Miami on drug charges after the agents tracked two of his drug mules. The mules had disembarked from a Jamaica-to-Miami cruise with defendant's cocaine, and the agents arrested him when he went to pick up the drugs from them. He told the agents he had met the mules in Pennsylvania;

- In March 2022, additional evidence from a cooperating witness further linked Steeps and Mercer to the murder and Wilkes-Barre; and

- The affidavit explained in detail why the target usernames were related to the murder investigation.

The clear takeaway is that this warrant application contained ample probable cause of these individual's involvement in Ryal's murder without any reference to information from the 2017 traffic stop. And those facts were immaterial to the officers' decision to seek these warrants, and any reasonable magistrate would have granted the warrants absent the references to Chen's texts in these four paragraphs described above.

The evidence from these warrants are admissible for several independent reasons. First, the information gathered from these social-media warrants in 2023 and 2024 is far attenuated

14

from the 2017 traffic stop. *See McKinnon*, 92 F.3d at 247.  It is important to remember the context: officers had been attempting to investigate an apparent murder-for-hire scheme since late 2016. By utter happenstance, defendant, one of the suspects in that investigation, was pulled over in a traffic stop in early 2017 just a few months after the murder. Evidence from that stop was suppressed in state court, and most of the state charges—drug offenses—were eventually dismissed. The officers encountered other challenges in their investigation and so were unable to bring murder charges at that point. The officers caught a break in their investigation via a 2019 DNA hit to Steeps, which plainly is unrelated to the 2017 traffic stop. The officers then continued to investigate the murder, collecting information from witness interviews, subpoenas, and warrants. The 2017 traffic stop was a blip on the radar screen of this murder investigation. Given all of the 1) unchallenged intervening events in the 2) more than six years between the February 2017 traffic stop and the 2023 warrants, and 3) the lack of connection between any misconduct in 2017 and the FBI's actions in seeking these social media warrants, any taint from the 2017 stop had long since dissipated by the time the officers sought these warrant. *See id.*

Second, even if the taint had not dissipated, the officers would have inevitably discovered the challenged evidence. As to whether the officers *would* have sought these same warrants, *see Alston*, 941 F.3d at 137, The government believes, if called as a witness at a hearing on this motion, Agent Gripka will testify that he would have sought these same warrants even if he had never learned about the 2017 traffic stop or any information derived from it. After all, he was investigating a 2016 murder for hire and drug trafficking activity from 2019, not the 2017 traffic stop.

As to whether they *could* have, *see id.*, it is clear that the officers did not need

15

information derived from the traffic stop to obtain these warrants. As described above, their independent investigation yielded ample probable cause without it. The only possible areas of overlap are the descriptions of Regina Chen's text messages and location information in four of the paragraphs, and the identity of Bedessie's email address. To be sure, the affidavits referenced both topics. But excising the Chen information still yields a warrant affidavit that any reasonable magistrate would have signed. And the officers had an independent and unchallenged source for Bedessie's email address for months prior to the warrant application, so they did not need any information from the 2017 traffic stop to know it. Moreover, the officers already knew of Bedessie, and her connection to defendant around the time of the murder, from speaking with T.C. in February 2017.

Given the above, these warrants are not the "fruits" of the 2017 traffic stop. Since that is the only challenge defendant makes to these warrants, *see* ECF 221 at 21–23, his motion as to them should be denied. We also note that, except as to one email address that belongs to defendant, none of the target email addresses or social-media accounts from these warrants belong to defendant. Since they are not fruits, defendant lacks standing to challenge them. *United States v. Taylor*, 857 F.2d 210, 214 (4th Cir. 1988) ("Fourth Amendment rights are . . . personal rights," and so a defendant "lack[s] standing to assert vicariously the rights of" others) (citations omitted).

## IV.    Defendant's undeveloped challenges to "dozens of subpoenas" and witness statements are too vague to respond to.

Defendant broadly challenges the admissibility of evidence obtained from the many subpoenas issued in this case and statements of any and all potential witnesses. *See generally* ECF 221 at 23–25. Because these sections do not concretely challenge any piece or pieces of

16

evidence, the government is unable to respond. *See, e.g.*, *United States v. Nguyen*, 313 F. Supp. 2d 579, 582 n.4 (E.D. Va. 2004) (government unable to respond to parts of inadequately developed motion to suppress) (citing Fed. R. Crim. P. 47).

These are not issues that can be adjudicated in the abstract. For example, in seeking to suppress the testimony of a live witness, courts assess multiple witness-specific factors, including "the degree of free will exercised by the witness"; "whether the illegally-seized evidence was used in questioning the witness; the time between the illegal search and initial contact with the witness; whether the investigators knew of the relationship between the witness and the defendant prior to their illegal search; and whether the police conducted the illegal search intending to find evidence implicating the defendant." *United States v. McKinnon*, 92 F.3d 244, 247–48 (4th Cir. 1996) (citing *United States v. Ceccolini*, 435 U.S. 268, 276, 278–280 (1978)). Given the lack of specificity of the current claims, this Court should decline to engage with them at this point and instead await additional motions, if any, that adequately raise these issues.

## Conclusion

This Court should deny as moot defendant's motion to suppress as to the materials the government does not intend to admit in its case in chief. As to the remaining evidence, this Court should deny the motion.

Respectfully submitted,

Lindsey Halligan
UNITED STATES ATTORNEY


By:      /s/
         Joseph E. DePadilla
         Brian J. Samuels

17

Assistant United States Attorneys
Graham M. Stolle
Special Assistant United States Attorney
Attorneys for the United States
United States Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, Virginia 23510
(757) 441-3674 Office
Email: joe.depadilla@usdoj.gov

## CERTIFICATE OF SERVICE


I HEREBY CERTIFY that on this 10th day of November, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.


By:    ___/s/_____
       Joseph E. DePadilla
       Assistant United States Attorney