**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **No. 2:24-cr-00038** |
| | § | |
| **ANTWAN HUE** | § | |
| | § | |
| | § | |

**MOTION TO STRIKE THE GOVERNMENT'S NOTICE OF INTENT TO SEEK THE**
**DEATH PENALTY**

**&**

**BRIEF IN SUPPORT**

The defendant, Antwan Hue, through counsel, moves this Court to strike the government's Notice of Its Intent to Seek the Death Penalty (ECF No. 223), filed on October 24, 2025 – 10 months after the government formally stated that it would *not* seek the death penalty in this case on December 27, 2024 (ECF No. 157). In support of this motion, Mr. Hue submits the following brief in support.

**TABLE OF CONTENTS**

I.  **Introduction**…………………………………………………………………….2

II.  **Background**………………………………………………………………..…….6

    A.  The Alleged Offense Conduct ……………………………………………6

    B.  Relevant Events Between May 2024 and January 2025 …..………………7

    C.  Events Following President Trump's January 20, 2025
       Executive Order and Attorney General Bondi's
       February 5, 2025 Directive to Federal Prosecutors ………………………8

III.  **Legal Argument**……………………………………………………………..11

A. The Government Waived Its Ability to Seek the Death Penalty by Failing to File Its § 3593(a) Notice of Intent to Seek the Death Penalty by the February 20, 2025 Deadline Set by this Court……………………11

B. Section 3593(a) Does Not Authorize a Reversal of Prior Decision by the Department of Justice Not to Seek the Death Penalty Reflected in a Formal Notice to the Court and Defendant………………………………18

C. This Court Should Strike the Government's October 24, 2025 Notice as Not Being Filed a "Reasonable Time" Before Any Capital Trial Date to Be Set in the Future…………………………………………..…..21

D. This Court Should Strike the Government's October 24, 2025 Notice Because "Good Cause" Does Not Exist for Its Filing……..…..……...28

E. The Government Is Estopped from Seeking the Death Penalty Under 18 U.S.C. § 3593(a)..……………..……………………..…...36

F. Permitting the Government to Seek the Death Penalty Would Violate the Fifth Amendment's Due Process Clause…..……………..…..40

G. Permitting the Government to Seek the Death Penalty Would Violate the Eighth Amendment's Cruel and Unusual Punishments Clause………41

IV. **Conclusion**………………………………………………………………42

## **BRIEF IN SUPPORT**

### **I.**
### **Introduction**

The government's October 24, 2025 notice of its intent to seek the death penalty is an affront to fundamental constitutional, statutory, and equitable principles. By simply ignoring its prior formal no-seek notice, the government seeks a radical, highly disruptive, and cost-prohibitive departure from the manner in which federal death penalty cases have been handled since the enactment of the Federal Death Penalty Act of 1994. As discussed below:

> • This Court should strike the government's October 24, 2025 notice because the government *waived* its ability to pursue the death penalty by filing its notice over eight months after this Court's February 20, 2024 deadline for giving such notice and ten months after announcing that it was *not* seeking the death penalty.

• In addition to the government's waiver, the operative statute, 18 U.S.C. § 3593(a), does not permit the government to seek the death penalty after filing a formal notice that the government was *not* seeking the death penalty.

• Even if § 3593(a) does not categorically bar such a diametric change in position, the government's October 24, 2025 notice is *per se* untimely under § 3593(a) regarding any future trial date in view of Mr. Hue's detrimental reliance on the December 27, 2024 no-seek notice and the *irreparable* prejudice that he has suffered.

• The government's October 24, 2025 notice, assuming *arguendo* that it is timely and that the statute permits such a change in position, is not supported by "good cause" under § 3593(a).

• The government is estopped from seeking the death penalty under the circumstances of this case.

• Permitting the government to seek the death penalty would violate due process and the Eighth Amendment.

At the outset, it should be understood that the government is seeking this Court's imprimatur for the creation of an entirely new regime for administration of the federal death penalty, in which the government would be empowered to keep both defendants and district courts guessing about whether the government will seek the death penalty even several years after the government has formally stated that it would *not* seek the death penalty. And, in that new regime, courts (and defendants) would be powerless to prevent such uncertainty. Permitting the government to proceed in that manner would work a radical change to longstanding norms and practices, reflected in federal statutes,[1] policies of the Judicial Conference of the United States (a portion of which the Department of Justice helped draft),[2] and even the Department of Justice's

---

[1] *See* 18 U.S.C. §§ 3005 & 3599(a).

[2] *See* GUIDE TO JUDICIARY POLICY, Vol. 7A, Appx. 2A: *Model Plan for Implementation and Administration of the Criminal Justice Act*, XIV.B.10, at 25-31 (Sept. 2025 rev.), available at https://www.uscourts.gov/file/vol07a-ch02-appx2apdf; GUIDE TO JUDICIARY POLICY (Vol 7., *Defender Services, Part A Guidelines for Administering the CJA and Related Statutes, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*), available at https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-17#:~:text=all%20capital%20cases.-,%C2%A7%20610.20%20Judicial%20Conference%20Recommendations,on%20the%20judiciary's%20public%20website.

own *Justice Manual*.[3]  Moreover, such a change would inject arbitrariness and fundamental unfairness into the area of our legal system in which courts "'as much as is humanly possible'" should take "'extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee . . . that the sentence was not imposed out of whim, passion, prejudice, or mistake.'" *Caldwell v. Mississippi*, 472 U.S. 320, 329 n.2 (1985) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 117-18 (1982) (O'Connor, J., concurring)).

In addition to causing such unfairness and arbitrariness, the government's proposed regime is simply not administrable and, indeed, would be entirely disruptive to the federal judiciary.  It effectively would require the courts to appoint two lawyers (at least one of whom qualifies as a "learned counsel"), a mitigation specialist, and capital experts for the *entire duration* of any potentially death-penalty-eligible case (before a conviction) and consequently administer a correspondingly large budget – thus imposing vast, potentially unlimited costs on the federal courts in the *several hundreds* of federal cases filed each year in which the death penalty could become a potential sentence,[4] even if the original indictment did not include death-penalty-eligible charges.[5]

---

[3] The relevant portion of the *Justice Manual* is available here: https://www.justice.gov/jm/jm-9-10000-capital-crimes.

[4] The U.S. Sentencing Commission's most recent annual data (2024) shows there were 344 cases sentenced under the sentencing guideline for first-degree murder (USSG § 2A1.1).  *See* U.S. Sent'g Comm., *2024 Sourcebook of Federal Sentencing Statistics* 44 (Tab. 20) (2025), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/2024_Sourcebook.pdf   Presumably, all (or at least the vast majority of) such cases either did or could have had charges carrying the death penalty as a potential punishment.

[5] This would include any case with non-capital charges related to a homicide that could be enhanced to capital charges in a superseding indictment.  *See, e.g.*, *United States v. Constanza-Galdomez*, 787 F. Supp.3d 131 (D. Md. 2025).  In *Constanza-Galdomez*, the government initially filed a no-seek notice when the charges were non-capital – a RICO conspiracy during which murders occurred, charged under 18 U.S.C. § 1962(d).  Over two years later, after the current administration assumed office, the government filed a superseding indictment alleging murder in

Our judicial system has many firm rules intended to promote fairness, predictability, and judicial efficiency – e.g., procedural rules requiring the filing of key documents (such as pretrial motions and notices of appeal) by certain dates (the noncompliance with which causes the loss of the right to file such documents); statutes of limitation; and speedy trial provisions. Of all areas in our legal system, it is critical that the government's administration of the death penalty should be subject to such rules.[6] The new regime proposed by the government in this and other recent cases[7] is anathema to fairness, predictability, and judicial efficiency.

---

the course of a racketeering enterprise under 18 U.S.C. § 1959(a) – a death-penalty-eligible offense – and then filed a notice of the government's intent to seek the death penalty. If the government's proposed regime were to be adopted, a federal district court at the outset of every such case would be required to appoint two attorneys (including a learned counsel), a mitigation specialist, and capital experts. Otherwise, a defendant would be prejudiced if the government eventually – even years later – decided to seek the death penalty.

[6] Although, as discussed *infra*, Mr. Hue raises several statutory, constitutional, and equitable grounds for striking the government's October 24, 2025 notice, he alternatively contends that this Court, exercising its "supervisory authority," should create a procedural rule and enforce it against the government. *See Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, (1987) (noting that "the exercise of supervisory authority is especially appropriate in the determination of the procedures to be employed by courts" that "directly concern[] the functioning of the Judiciary"). Federal courts, including district courts, "may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress," so long as the rules do not "circumvent or conflict with the Federal Rules of Criminal Procedure." *Carlisle v. United States*, 517 U.S. 416, 426 (1996) (citations and internal quotation marks omitted). Significantly, Mr. Hue is asking this Court to create a procedural rule related to the proper functioning of the federal judiciary in federal capital cases. He is not asking this Court to create a substantive or evidentiary rule and his proposed rule does not circumvent or conflict with any statute or any Federal Rule of Criminal Procedure. Indeed, as discussed below, his proposed rule is fully consistent with Congress' purpose in enacting 18 U.S.C. §§ 3005 and 3593 and also is fully consistent with the Department of Justice's *Justice Manual* and policies of the Judicial Conference of the United States concerning federal capital cases. Mr. Hue's proposed rule would only prohibit the death penalty when the government previously expressly disclaimed an intent to seek it in a formal filing with the court.

[7] See cases cited in footnote 8, *infra*.

Just as the growing chorus of courts have done in other recent cases in which the government has attempted to renege on its prior formal representations that it was *not* going to seek the death penalty,[8] this Court should strike the government's October 24, 2025 notice with prejudice.

## II.
## Background

### A. The Alleged Offense Conduct

According to the allegations in the superseding indictment:

Beginning in or about October 2016, and continuing to in or about the Spring of 2017, within the Eastern District of Virginia, and elsewhere, ANTWAN HUE, a/k/a "Tony," a/k/a "T, DESHAWN MERCER, a/k/a "Shizz," and ZQUAN STEEPS, a/k/a Los, a/k/a LosKorleone," the defendants herein, aided and abetted by each other and others, did knowingly and intentionally travel in and cause another and others to travel in interstate commerce, and to use and cause another and others to use facilities in interstate commerce, that is, automobiles and cellular telephones,

---

[8] *United States v. Constanza-Galdomez*, 787 F. Supp.3d 131 (D. Md. 2025); *United States v. Spurlock*, 782 F. Supp.3d 987 (D. Nev. 2025); *United States v. Merrell*, No. 20-cr-046-1, 2025 WL 2911170 (N.D. W. Va. Oct. 7, 2025); *United States v. Dangleben*, No. 23-cr-0072, 2025 WL 2647195 (D.V.I. Sept. 15, 2025), *on government's appeal* (3d Cir., No. 25-2807) (oral argument conducted on December 9, 2025); *United States v. Cole & Smith*, 799 F. Supp.3d 438 (D.V.I. Sept. 7, 2025); *see also United States v. Suarez*, 801 F. Supp.3d 872 (N.D. Cal. Sept. 23, 2025) (terminating the status of the case as a potential death penalty prosecution based on the reasoning of *Spurlock*, *supra*, and *Constanza-Galdomez*, *supra*). In addition, in *United States v. Martinez et al.*, No. 2:19-cr-00117-ODW (C.D. Cal.), the district court – when the prosecutors stated that they could not guarantee that the Department of Justice would not change it position after the November 2024 election – stated that it would not permit the government to renege on its formal notice that it would not seek the death penalty. *See* No. 2:19-cr-00117-ODW (ECF No. 1248, at 12-13) (Aug. 12, 2024). The court stated:

> I'm not going to permit something that unfair to take place in this court. . . . I'm going to say this for the last time. You can't tell people that this form of punishment is off the table so that they can now sleep again and then change your mind and go, "It's back on again." No. . . . .

*Id.* at 12-13. In *Martinez*, the prosecutor stated that he had conferred with the Capital Case Section of the Department of Justice and was informed that a reversal of a no-seek notice "ha[d] never happened before." *Id.* at 8.

with intent that a murder be committed, in violation of the laws of the United States and the Commonwealth of Virginia, as consideration for the receipt of, and as consideration for a promise and agreement to pay, things of pecuniary value, resulting in the death of Charlene Ryals.

ECF No. 3, at 24.

The indictment further alleges that:

On or about December 4, 2016, in Norfolk, Virginia, in the Eastern District of Virginia, defendant ANTWAN HUE, while engaged in an offense punishable under Title 21, United States Code, Section 841(b)(1)(A), to wit: conspiracy to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, as alleged in the General Allegations section of this Indictment and Count Four of this Indictment, which are re-alleged and incorporated as if set forth fully herein, did intentionally kill, and did counsel, command, induce, procure, and cause the intentional killing of, victim Charlene Ryals, and such killing did result.

*Id.* at 25.

**B. Relevant Events Between May 2024 and January 2025**

On May 8, 2024, the grand jury indicted Mr. Hue for (1) conspiracy to commit a murder for hire and a substantive count of murder for hire, in violation of 18 U.S.C. § 1958(a); (2) murder while engaging in a drug-trafficking offense, in violation of 21 U.S.C. §§ 841 & 848(e)(1); and (3) drug-trafficking conspiracy, in violation of 21 U.S.C. §§ 841 & 846.   ECF No. 3.  Mr. Hue was arrested on June 4, 2024.  ECF No. 14.  He made his initial appearance on the indictment on July 10, 2024.  ECF No. 71.

On June 4, 2024, this Court appointed Assistant Federal Public Defender (AFPD) Keith Kimball and CJA Attorney Shawn Cline to represent Mr. Hue.  Cline later withdrew and eventually was replaced by CJA Attorney Douglas Anthony Ramseur on October 15, 2024.  Two other AFPDs, Andrew Grindrod and Amy Austin, entered appearances for Mr. Hue in 2024 before Ramseur's appearance in the case.  Ms. Austin assumed the role of "learned counsel" under 18 U.S.C. § 3005.

On September 29, 2024, Mr. Hue's counsel filed a motion to require the government to announce – one way or the other – whether the government would seek the death penalty by a date certain. ECF No. 106. In response, on October 18, 2024, the government agreed that this Court had the authority to set a deadline for the government to announce whether it intended to seek the death penalty (but opposed any order specifically requiring the local U.S. Attorney's office to submit its recommendation to the Department of Justice's Capital Case Review Committee in Washington, D.C. by a date certain). ECF No. 133.

On October 23, 2024, this Court issued an order requiring the government by February 20, 2025, to announce whether it would seek the death penalty. ECF No. 144.

On December 27, 2024, the government filed a notice stating that it would not seek the death penalty (hereafter called the "no-seek notice") – which both underscored and bold-faced the word "**not**." ECF No. 157.[9]

### C. Events Following President Trump's January 20, 2025 Executive Order and Attorney General Bondi's February 5, 2025 Directive to Federal Prosecutors

Following the election and inauguration of President Trump, this case took a dramatic turn when the Department of Justice sought to renege on its prior formal representation that it would not seek the death penalty. On January 20, 2025, after assuming office, President Trump immediately issued an executive order, "Restoring the Death Penalty and Protecting Public

---

[9] Based on procedural requirements set forth in the Department of Justice's *Justice Manual*, the U.S. Attorney's Office was required to notify the Department's Capital Case Section (CCS) in Washington, D.C., that the office was filing an indictment alleging a capital offense that potentially carried the death penalty. JUSTICE MANUAL § 9-10.180 (2020 & current versions). According to the *Justice Manual*, the CCS, in consultation with the Attorney General, is responsible for determining whether the office should seek – or not seek – the death penalty. Therefore, the U.S. Attorney's office communicated with the CCS from the outset of this federal prosecution in 2024 and followed the directions of the CCS concerning whether to seek the death penalty.

Safety."[10]  That executive order explicitly stated: "The Attorney General shall pursue the death penalty for all crimes of a severity demanding its use" and also stated that the Attorney General "shall pursu[e] the death penalty where possible."[11]

On February 4, 2025, Pamela Bondi was confirmed by the Senate to be U.S. Attorney General.  On February 5, 2025, Attorney General Bondi issued a memorandum to attorneys in the Department of Justice, "Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions" (hereafter called the "Bondi Memorandum").[12]  That memorandum stated that: "The Attorney General's Capital Review Committee is directed to review no-seek decisions in all pending capital-eligible cases (i.e., death-eligible cases that have not yet resulted in a conviction) charged between January 20, 2021, and January 19, 2025."[13]  Her memo specifically stated that "[t]he review required by this paragraph shall be completed within 120 days" – i.e., by June 5, 2025.[14]

On February 19, 2025 – one day before the existing deadline for notifying this Court about whether the government would seek the death penalty – the government filed a "Notice Regarding Status of Defendant," which noted Attorney General Bondi's February 5, 2025 memorandum and stated that the Department of Justice thus would be "reevaluat[ing]" its December 27, 2024 no-seek notice.  ECF No. 164.[15]  That notice did not request an order from this Court extending the

---

[10]  That executive order is available at  https://www.whitehouse.gov/presidential-actions/2025/01/restoring-the-death-penalty-and-protecting-public-safety/

[11] *Id.*

[12] That memorandum is available at: https://www.justice.gov/ag/media/1388561/dl?inline.

[13] *Id.*

[14] *Id.*

existing February 20, 2025 deadline for filing a notice of the government's intent to seek the death penalty. *See id.*

By the 120th day after the Bondi Memo – June 5, 2025 – the government did not provide this Court or defense counsel any notice (one way or the other) about whether the government would be changing its position on whether it would be seeking the death penalty against Mr. Hue. Nor by June 5, 2025, had the government (either the local U.S. Attorney's office or the Capital Review Committee in Washington, D.C.) requested a meeting with Mr. Hue's defense team (to permit a defense presentation against reconsideration of the prior "no-seek" notice). The defense team and Mr. Hue were aware of the June 5, 2025 deadline and believed that, when it passed without any communication from the government, it was a clear indication that the government would not seek to renege on its prior no-seek notice. *See* **Exhibit A** ¶¶ 17 & 18 (declaration of Douglas Ramseur).

On June 23, 2025, Mr. Hue's attorneys from the Federal Public Defender's office moved to withdraw because of an ethical conflict. ECF No. 197. On July 2, 2025, this Court granted their motion and appointed Joseph King as "learned counsel" for Mr. Hue on August 6, 2025. ECF No. 202.

On September 9, 2025 – just one month after the appointment of new learned counsel, Joe King – the Capital Case Review Committee (CCRC) held a Webex meeting at which Mr. Hue's other counsel, Doug Ramseur, made a presentation seeking the convince the Department of Justice not to renege on its prior no-seek notice. That meeting occurred without the participation of

---

[15] The government's February 19, 2025 notice noted that: "According to the Attorney General's Memorandum, this reevaluation will be completed within 120 days of the memorandum's issuance" – i.e., *by June 5, 2025*. ECF No. 164, at 1.

learned counsel King, because the CCRC was unwilling to reschedule it to accommodate Mr. King's prior scheduling conflict.  *See* **Exhibit A** ¶¶ 21 & 22 (declaration of Douglas Ramseur); **Exhibit B** ¶¶ 6-9 (declaration of Joseph King).

On October 24, 2025 – 10 months after originally filing a no-seek – the government filed a notice of its intent to seek the death penalty.  ECF No. 223.  That notice was not accompanied by a motion for leave to file the clearly out-of-time notice in view of this Court's February 19, 2025 filing deadline and offered no reasons for the government's diametric change in position or extensive delay in changing it position.  It also offered no reason for not providing its notice by June 5, 2025 – i.e., within the 120-day period that Attorney General Bondi's memorandum had set forth as the time in which to reevaluate capital cases in which no-seek notices had been filed during the former administration.

As of the filing of this motion, no trial date has ever been scheduled in this case.

### III.
### Legal Argument

For many independent reasons, this Court should strike the government's October 24, 2025 notice of its intent to seek the death penalty against Mr. Hue.

### A.  The Government Waived Its Ability to Seek the Death Penalty by Failing to File Its § 3593(a) Notice of Intent to Seek the Death Penalty by the February 20, 2025 Deadline Set by this Court.

18 U.S.C. § 3593(a) provides:

If, in a case involving an offense described in section 3591 [i.e., a federal offense carrying the death penalty as the maximum possible punishment], the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice –

(1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is

justified under this chapter and that the government will seek the sentence of death; and

(2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

18 U.S.C. § 3593(a).

In its October 23, 2024 order granting Mr. Hue's motion to set a deadline for the government to announce whether it intended to seek the death penalty, this Court correctly held that "[t]his statutory language [in § 3593(a)] implies that the Court has authority to direct the timing of the filing of notice of intent to seek the death penalty."  ECF No. 144, at 3.  Notably, in its response to Mr. Hue's motion, the government explicitly agreed that this "Court can certainly set a deadline for filing a notice of intent to seek the death penalty . . . ."  ECF No. 133, at 7.

The setting of a such a deadline is recommended in the *Guide to Judicial Policy* of the Judicial Conference of the United States.[16]  Significantly, the Department of Justice helped develop this very provision in the *Guide*.  *See United States v. McGill*, No. 09-cr-2856, 2010 WL 1571200, at *3 (S.D. Cal. Apr. 16, 2010) ("In September of 2007, the Judicial Conference of the United States approved a *Criminal Justice Act Guideline*, developed jointly by Department of Justice staff and defender services representatives, which recommends that the trial court establish a schedule for resolution of whether the government will seek the death penalty.  *Guide to Judiciary Policy*, Vol. 7, Pt. A, Ch. 6, § 670.").  Since § 670's promulgation, district courts around the country

---

[16] *See* U.S. Courts, *Criminal Justice Act Guidelines*, GUIDE TO JUDICIARY POLICY, Vol. 7 *Defender Services, Part A: Guidelines for Administering the CJA and Related Statutes*, Ch. 6 § 670 (Jan. 2025 ed.) ("Within a reasonable period of time . . . the court should establish a schedule for resolution of whether the Government will seek the death penalty" and set dates for the "filing of a notice under 18 U.S.C. § 3593(a) that the Government will seek the death penalty, or notification to the court and the defendant that it will not.").

regularly have followed this recommendation.[17]  Furthermore, the Department of Justice's own *Justice Manual* recognizes the authority of courts to set such deadlines, as it requires that a capital-eligible case be submitted to the Capital Case Review Committee "no fewer than 90 days *before the Government is required, by an order of the court, to file a notice that it intends to seek the death penalty*."  *Justice Manual*, § 9-10.060 (emphasis added).

Courts do not view such court-imposed deadlines as toothless.  They regularly have struck the government's notices of intent to seek the death penalty when the government filed such notices after failing to meet court-imposed deadlines (either deadlines set in individual cases or deadlines established by local rules).  *See, e.g.*, *Spurlock*, 782 F. Supp.3d at 1004-09; *Dangleben*, 2025 WL 2647195, at *3-*5; *Cole*, 799 F. Supp.3d at 449-53; *United States v. Ball*, Criminal Action No. 05-100-01, 2006 WL 8570266 at *1-*2 (D.D.C. Oct. 19, 2006); *United States v. Gomez-Olmeda*, 296 F. Supp.2d 71, 86 (D.P.R. 2003).

"Courts set and enforce pretrial deadlines by which parties must act all the time.  Such deadlines are applied against the government and defense alike.  . . .  To hold that a court cannot fix and enforce such pretrial deadlines would undermine the orderly, expeditious and fair administration of criminal justice in ways difficult to fully imagine."  *Ball*, 2006 WL 8570266, at *1-*2.  Of all type of cases, a criminal case with charges carrying the potential of a death sentence is one in which such a deadline should be most strictly enforced (against the government).  *See Caldwell v. Mississippi*, 472 U.S. 320, 329 n.2 (1985) (holding that courts "'as much as is humanly

---

[17] *See, e.g.*, *United States v. Rivas-Moreiera*, No. 1:22-CR-27, 2023 WL 11960650, at *1 (E.D. Tex. Oct. 7, 2023) ("[T]he court has the inherent power to manage its own docket, including the timing of the Government's filing of its notice of intent to seek the death penalty under 18 U.S.C. § 3593(a).") (citing *United States v. Crusius*, No. EP-20-CR-00389-DCG, 2020 WL 4340550, at *7 (W.D. Tex. July 28, 2020); *United States v. Rubio-Rangel*, No. 4:18-cr-274, Doc. 165 (S.D. Ga. Oct. 23, 2019); *United States v. Tsarnaev*, No. CRIM.A. 13-10200-GAO, 2013 WL 5701582, at *2 (D. Mass. Oct. 18, 2013); *United States v. Slone*, 969 F. Supp. 2d 830, 838 (E.D. Ky. 2013)).

possible'" should take "'extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee . . . that the sentence was not imposed out of whim, passion, prejudice, or mistake'") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 117-18 (1982) (O'Connor, J., concurring)).[18]

Any argument by the government that it has unfettered discretion to file a notice of its intent to seek the death penalty pursuant to 18 U.S.C. § 3593(a), a part of its prosecutorial discretion to bring whatever *charges* it deems appropriate – regardless of any court-imposed filing deadlines – clearly would lack merit. Unlike its ability to bring superseding charges, the government's ability to seek *enhanced penalties* for an existing charge is subject to procedural default by the government for failure to comply with procedural requirements. *See, e.g.*, *United States v. Ivy*, 83 F.3d 1266, 1296-98 (10th Cir. 1996) (holding that the government forfeited its right to invoke the otherwise applicable 20-year mandatory minimum penalty required by 21 U.S.C. §§ 841(b)(1)(A) & 851 by failing to object to the presentence report's erroneous statement that the defendant's mandatory minimum penalty was only 10 years, notwithstanding the government's timely pretrial filing of a § 851 information alleging the defendant's prior drug conviction as a basis for sentencing enhancement); *United States v. Tello*, 687 F.3d 785, 798-99 (7th Cir. 2012) ("[T]here was no legitimate reason for the government to ignore the accessory-after-the-fact guideline at the time of Hill's first sentencing, and its failure to do so resulted in a

---

[18] Such enforceable deadlines, of course, also exist in civil cases. *See, e.g.*, *American Civil Liberties Union of Kentucky v. McCreary County, Ky.*, 607 F.3d 439, 451 (6th Cir. 2010) ("[B]ased on the district court's power to manage its own docket, the court had ample discretion to strike Defendants' late renewed motion for summary judgment."); *Ready Transp., Inc. v. AAR Mfg.*, Inc., 627 F.3d 402, 403-04 (9th Cir. 2010) (holding that a district court has "inherent power to strike an improperly filed" document). If noncompliance with court-set deadlines has such consequences in civil cases involving only money damages, such noncompliance in a criminal case potentially carrying the death penalty surely should receive the same treatment.

waiver of its arguments as to [an increased sentence under] that guideline."); *United States v. Petite*, 703 F.3d 1290, 1292 n.2 (11th Cir. 2013) ("The government cannot offer for the first time on appeal a new predicate conviction in support of an enhanced ACCA sentence [that is set forth in the presentence report]. The argument should have been made prior to or during sentencing, allowing Petite the opportunity to object and offering the sentencing court an opportunity to fairly consider the issue in the first instance."), *overruled on other grounds by Johnson v. United States*, 576 U.S. 591 (2005).

Nor could the government validly argue that enforcement of a court-imposed deadline (imposed pursuant to the court's "inherent authority") conflicts with 18 U.S.C. § 3593(a) to the extent that the statute affords the government authority to give notice of its intent to seek the death penalty.  *See generally Degen v. United States*, 517 U.S. 820, 823 (1996) (noting "the inherent powers of the courts may be controlled or overridden by statute of rule").  Although § 3593(a) governs the notice requirement (and thereby authorizes the government to seek the death penalty), a court-imposed, enforceable deadline for the government to give such statutorily-required notice is valid because it does not conflict with the statute.  Such a court-imposed deadline merely sets a reasonable *condition* on the government's authority under § 3593(a).  *Cf. United States v. Lopez-Cavasos*, 915 F.2d 474, 478 (9th Cir. 1990) (holding that a local rule that required objections to the presentence report to be filed by a certain date – or otherwise be waived – did not conflict with Federal Rule of Criminal Procedure 32's provision permitting parties to comment on the presentence report at sentencing because the local rule "did not eliminate the opportunity to comment at the sentencing hearing [and] instead . . . merely placed a condition on that right – namely, that a party indicate his or her objections to the [PSR] prior to the sentencing hearing"); *Jetton v. McDonnell Douglas Corp.*, 121 F.3d 423, 426 (8th Cir. 1997) (concluding that "Local

Rule 4.01 is not in conflict with Federal Rule [of Civil Procedure] 56 but merely supplements the Federal Rule by setting forth the specific time (20 days) for a response to a motion for summary judgment").

The government's waiver of its ability to seek the death penalty in Mr. Hue's case is particularly indefensible. This is not a case in which the government merely missed a court-imposed deadline to give notice of intent to seek the death penalty. Instead, on December 27, 2024 – before the deadline – the government gave express, formal notice that it would *not* seek the death penalty (and now seeks to renege on that position). Furthermore, the day before the February 20, 2025 deadline and two weeks after the issuance of Attorney General Bondi's February 5, 2025 memorandum, the government filed a "Notice Regarding Status of Defendant," which did not seek an extension in this Court's deadline – and, instead, merely announced that the Department of Justice was "reevaluat[ing]" its December 27, 2024 no-seek notice. ECF No. 164, at 1. The government was well aware of its ability to seek an extension of the court-imposed deadline before the deadline had passed[19] but opted not to do so. And, finally, before it filed its October 25, 2025 notice of its intent to seek the death penalty, the government failed to move for leave to withdraw the December 27, 2024 notice and file the October 25, 2025 notice in its place. Finally, the government also missed its own June 5, 2025 deadline for reevaluating its no-seek notice in Mr. Hue's case.

The Supreme Court has explained that "waiver is the intentional relinquishment or abandonment of a known right," which "extinguish[es]" that right. *United States v. Olano*, 507 U.S. 725, 733 (1993) (noting that "forfeiture is the failure to make the timely assertion of a right,"

---

[19] *See, e.g.*, ECF No. 121 (government's motion requesting an extension in a court-imposed deadline for filing responses to Mr. Hue's pretrial motions).

while "waiver is the intentional relinquishment or abandonment of a known right"). Both the government and criminal defendants are subject to the waiver/forfeiture doctrine. "[W]hat is sauce for the defendant's goose is sauce for the government's gander." *United States v. Caraballo-Cruz*, 52 F.3d 390, 393 (1st Cir. 1995) (referring to waiver); *see also Eberhart v. United States*, 546 U.S. 12, 19 (2005) ("Here, where the Government failed to raise a defense of untimeliness until after the District Court had reached the merits, it forfeited that defense."); *United States v. Perkins*, 108 F.3d 512, 516 & n.15 (4th Cir. 1997) (applying the same forfeiture/waiver analysis to a claim of error asserted by the government for the first time on appeal just as the court applies to a claim raised by a defendant for the first time on appeal). Capital defendants have been executed because their lawyers missed filing deadlines. *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722 (1991) (concluding that a death row inmate's post-conviction attorneys' failure to file a timely notice of appeal procedurally defaulted his federal constitutional claims; the prisoner was later executed without federal court review of the merits of his claims). For the same reason, the government should be prevented from seeking the death penalty when it missed a filing deadline concerning the required notice under § 3593(a).

"Justice Holmes famously wrote that '[m]en must turn square corners when they deal with the Government.' . . . But it is also true, particularly when so much is at stake, that 'the Government should turn square corners in dealing with the people.'" *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 24 (2020) (citations omitted). In a case involving the most severe action that any government can take – extinguishing human life as a penalty for a crime – the government here has failed to turn square corners and, thus, has waived its right to seek the death penalty.

**B. Section 3593(a) Does Not Authorize a Reversal of Prior Decision by the Department of Justice Not to Seek the Death Penalty Reflected in a Formal Notice to the Court and Defendant.**

In addition to finding waiver by the government by failing to comply with this Court's filing deadline, this Court should interpret § 3593(a) in a manner that does not authorize the government to reverse its prior formal decision *not* to seek the death penalty – that is, this Court should conclude that a no-seek notice is "irrevocable." *United States v. Suarez*, 801 F. Supp.3d at 878; *see also Spurlock*, 792 F. Supp.3d 987, 1008 (D. Nev. 2025); *cf. United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) (in discussing the requirement that two counsel – including one "learned counsel" – be appointed in a capital case under 18 U.S.C. § 3005, the court noted "the government's *irrevocable decision* not to pursue the death penalty" when it filed a notice that it was not seeking the death penalty) (emphasis added).

Although § 3593(a) does not explicitly address whether the government can seek the death penalty after previously filing a no-seek notice, the statute expressly permits an amendment of a prior notice of the government's intent to *seek* the death penalty only upon a showing of "good cause."[20]  If the statute requires good cause for such a relatively minor change in the government's position, it would be absurd for government to be permitted to engage in a completely diametric change in position after it filed a formal unconditional notice that it would not seek the death penalty.  *See Holland v. Big River Mins. Corp.*, 181 F.3d 597, 603 n.2 (4th Cir. 1999) (statutes should be interpreted to avoid absurd results); *see also Lara-Aguilar v. Sessions*, 889 F.3d 134, 144 (4th Cir. 2018) (explaining that, "to truly be characterized as absurd, the interpretation of a

---

[20]  18 U.S.C. § 3593(a)(2) ("The court may permit the attorney for the government to amend the notice upon a showing of good cause.").

statute must result in an outcome that is so gross as to shock the general moral or common sense")
(quotation marks omitted).

Section 3593(a) does not explicitly require formal notice of the government's decision *not* to seek the death penalty against a particular defendant facing capital charges. However, the Department of Justice, as reflected in its *Justice Manual*,[21] clearly believes such notice is implicitly

---

[21] The *Justice Manual* provides that:

**9-10.030 - Purposes of the Capital Case Review Process**

The review of cases under this Chapter culminates in a decision to seek, **or not to seek**, the death penalty against an individual defendant. Each such decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws. . . .

**9-10.040 - Consultation With the Capital Case Section**

Prior to seeking an indictment for an offense potentially punishable by death, the United States Attorney or Assistant Attorney General shall consult with the Capital Case Section. . . .

***

**9-10.150 - Post-Decision Actions**

In any case in which the Attorney General has directed the filing of a notice of intention to seek the death penalty, the United States Attorney or Assistant Attorney General shall not file or amend the notice until the Capital Case Section has approved the notice or the proposed amendment. The notice of intention to seek the death penalty shall be filed as soon as possible after transmission of the Attorney General's decision to seek the death penalty.

The United States Attorney or Assistant Attorney General should promptly inform the district court and counsel for the defendant once the Attorney General has made the ***final decision***. Expeditious communication is necessary ***so that the court is aware***, ***in cases in which the Attorney General directs the United States Attorney or Assistant Attorney General not to seek the death penalty***, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required. In cases in which the Attorney General directs the United States Attorney or Assistant Attorney General to seek the death penalty, the district court and defense counsel

required by § 3593(a) in view of the requirements of a related statute, 18 U.S.C. § 3005, which mandates appointment of two defense counsel (at least one of whom is a qualified "learned counsel") in a federal death penalty case. In particular, in order to relieve district courts of their statutory obligation under § 3005, the *Justice Manual* requires the filing of a no-seek notice "so that the court is aware, in cases in which the Attorney General directs the United States Attorney or Assistant Attorney General ***not*** to seek the death penalty, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required." *Justice Manual* § 10.150 (emphasis added).

Equally important, the Department of Justice views a no-seek notice as the Attorney General's "final decision." *See Justice Manual* §§ 10.050 & 10.150.[22] Although the *Justice Manual* itself does not create any enforceable rights for defendants, the *Justice Manual* nonetheless clearly supports Mr. Hue's interpretation of § 3593(a).

For these reasons, this Court should strike the government's October 24, 2025 notice – regardless of whether the government's notice was filed within a "reasonable time" before a future trial date or was supported by "good cause" within the meaning of § 3593(a) (of which it was neither – issues discussed *infra*). At the very least, even if not required by the statute itself, this Court should hold – as a matter of this Court's supervisory authority[23] – that, once the government has filed a formal notice of its intent ***not*** to seek the death penalty, it may not thereafter seek the

---

should be given as much opportunity as possible to make proper scheduling decisions.

JUSTICE MANUAL §§ 9-10.030, 9-10.040 & 9-10.150.

[22] In contrast, the *Justice Manual* provides for the government's withdrawal of a notice of intent to seek the death penalty. *Justice Manual* § 9-10.160 ("Withdrawal of the Notice of Intention to Seek the Death Penalty").

[23] *See supra* note 6.

death penalty, at least when the defendant has detrimentally relied on the original no-seek notice (as Mr. Hue did, *see infra*).

### C. This Court Should Strike the Government's October 25, 2025 Notice as Not Being Filed a "Reasonable Time" Before Any Capital Trial Date to Be Set in the Future.

Assuming *arguendo* that § 3593(a) does not categorically prohibit a reversal of the government's formally-announced decision *not* to seek the death penalty,[24] this Court should strike the government's October 24, 2025 notice as not having been filed "*a reasonable time* before the trial or before acceptance by the court of a plea of guilty . . . ." 18 U.S.C. § 3593(a) (emphasis added).

Section 3593(a) is "a prophylactic statute, one of the chief aims of which is to protect the accused from having to endure a trial for his life for which he was not on reasonable notice, [which requires] inquiry into the objective reasonableness of the time between issuance of the Death Notice and the trial itself, in light of the particulars of" each case. *United States v. Ferebe*, 332 F.3d 722, 727 (4th Cir. 2003). Thus, a district court must conduct "a pretrial inquiry into the objective reasonableness of the [timeliness of the] notice provided." *Id*. at 731; *accord United States v. Wilk*, 452 F.3d 1208, 1221 (11th Cir. 2006) (citing Fourth Circuit precedent, including *Ferebe*). Such an analysis must consider all relevant circumstances. *See Ferebe*, 332 F.3d at 737 (noting the four factors set forth by the court were considered "non-exclusive factors"); *see also Wilk*, 452 F.3d at 1221 n.23 (stating that "evaluating objective reasonableness requires an unrestricted evaluation of all the circumstances").

---

[24] In Part III.B., Mr. Hue explains why such a change in position is prohibited under § 3593(a). In Part III.C., he alternatively contends that the government's October 24, 2025 notice is untimely under § 3593(a) even, assuming *arguendo*, that it is not categorically prohibited by § 3593(a).

In *Ferebe* and *Wilk*, there was an existing trial date when the government filed its notice that it would seek the death penalty against the defendants. Conversely, there was no such existing trial date in Mr. Hue's case. Nevertheless, the lack of scheduled trial date does not foreclose or weaken his argument that the government's October 24, 2025 notice was not made "a reasonable time" before a *future* trial. 18 U.S.C. § 3593(a). The lack of a trial date is simply one factor (among many) to consider in this Court's "unrestricted evaluation of all the circumstances." *Wilk*, 452 F.3d at 1221 n.23. The ultimate question is whether the October 24, 2025 notice was "reasonable" in relation to any *future* capital trial date that may be scheduled. With respect to that question, the most important circumstance to be considered is the fact that Mr. Hue has been *irreparably* prejudiced by the government's no-seek notice followed by its attempt to reverse that position nearly a year later.[25]

Significantly, in both *Ferebe* and *Wilk*, although there were trial dates in effect when the government gave notice of its intent to seek the death penalty, the government had not in either case given prior formal notice that the government would *not* seek the death penalty and then later sought to renege on that assurance. Therefore, the various factors mentioned by the Fourth and

---

[25] In *Ferebe*, the Fourth Circuit held that a court need not consider prejudice in deciding whether the government's notice of its intent to seek the death penalty was filed a reasonable time before trial. *Ferebe*, 332 F.3d at 733-34. However, the Fourth Circuit did not prohibit a consideration of prejudice (if a defendant chooses to make such a showing) and also did not address the scenario of a case with no trial date (such as Mr. Hue's case).

Eleventh Circuits – *see Wilk*, 452 F.3d at 1221;[26] *Ferebe*, 332 F.3d at 737[27] – are not particularly relevant when assessing whether the government's October 24, 2025 notice (seeking to renege on its December 27, 2024 no-seek notice) was "reasonable" in view of any *future* capital trial date.

The type of potential prejudice at issue in *Ferebe* and *Wilk* (i.e., a defendant being rushed to a capital trial and thus having insufficient time to defend against the capital charges and death sentence being sought by the government) is an entirely different species of prejudice than the type at issue in Mr. Hue's case. The prejudice that Mr. Hue faces if this Court permits the government to seek the death penalty relates to the *irreparable* prejudice that he *already* has suffered as a result of the government's filing a no-seek on December 27, 2024, followed by its October 24, 2025 notice seeking to renege on its prior notice. There is simply no way to remedy that prejudice except to strike the October 24, 2025 notice.

Courts in other recent federal cases involving the government's attempts to renege on its prior no-seek notices have recognized the irreparable prejudice that capital defendants suffer when their defense teams detrimentally relied on prior no-seek notices. *See Merrell*, 2025 WL 2911170, at *2 ("[T]he Government previously filed a Notice with the Court – which must carry some weight

---

[26] *Wilk*, 452 F.3d at 1221 ("[T]o determine whether notice was filed an objectively reasonable time before trial, we must consider the totality of the circumstances, including, but not limited to: (1) what transpired in the case before the formal Death Notice was filed; (2) the period of time remaining for trial after the Death Notice was filed; (3) the status of discovery and motions in the proceedings; (4) the nature of the charges in the indictment; (5) the nature of the aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the defense, if known.").

[27] *Ferebe*, 332 F.3d at 737 ("To judge an accused's challenge to the reasonable timeliness of a Death Notice requires evaluation of, among other factors that may appear relevant, (1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and, in addition, (4) the status of discovery in the proceedings.").

– that it would not seek the death penalty. Defendant's legal team rightly altered its preparation in light of that Notice, and now would be required to change course again if the Government is permitted to seek the death penalty. *But the real damage is to what the Defendant's legal team cannot get back*, which is investigation and other preparation that would have occurred closer in time to the alleged events and without the damage delay brings to an investigation.") (emphasis added); *Constanza-Galdomez*, 787 F. Supp.3d at 137, 145-46 (holding that the government's notices of its intent to seek the death penalty against the three defendants to be "*incurably defective*" because, *inter alia*, the defendants relied to their detriment by waiving their rights to a speedy trial after the government had initially declared that it was not seeking the death penalty) (emphasis added); *Spurlock*, 782 F. Supp.3d at 1011 ("[R]egardless of the impact of an another continuance on Spurlock's rights under the Speedy Trial Act *per se*, there is no real question that an additional delay would cause some degree of additional prejudice against him – because of the added pursuit of capital punishment itself, the impact of a no-seek notice on defense preparation, and simply the fact a delay would extend Defendant's time in pretrial custody."); *id.* ("*Spurlock will never be in the position he was eight months ago no matter the length of any continuance*: At many junctures, the capital or non-capital nature of a trial may lead the defense to make decisions which are mutually exclusive to those which would be made if the posture were different. . . . *See,*

*e.g.*, *ABA Guidelines* 10.4, 10.5, 10.11.[28]”) (record citations and internal quotation marks omitted) (emphasis added).[29]

---

[28] *See* American Bar Association (ABA), GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (“ABA's *Guidelines*”) *reprinted in* 31 HOFSTRA L. REV. 913 (2003); *see also* ABA, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, *reprinted in* 36 HOFSTRA L. REV. 677, 689-92 (2008). The Supreme Court has looked to the ABA's *Guidelines* in determining whether a capital defense attorney provided ineffective assistance of counsel. *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In addition, the Judicial Conference of the United States Courts has recommended that: “All attorneys appointed in federal capital cases should comply with the American Bar Association's 2003 *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (Guidelines 1.1 and 10.2 et seq.) and the *2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*.” GUIDE TO JUDICIARY POLICY, Vol. 7A, Appx. 2A: *Model Plan for Implementation and Administration of the Criminal Justice Act*, XIV.B.10, at 25-27 (Sept. 2025 rev.)

[29] The court in *Spurlock* further stated that:

> Here, when the government filed its July No-Seek Notice, it led learned counsel to withdraw and the defense to cease its capital-trial-focused aggravating factor and mitigation investigations. By the time the government suddenly asked the defense to prepare new mitigation for potential reversal of its no-seek decision, Spurlock had spent multiple additional months in pretrial detention without the real opportunity to continue his mitigation investigation or to integrate that investigation into his broader strategy, without the benefit of learned counsel, and without advice from counsel related to continued exposure to capital punishment. *See ABA Guidelines*, Guideline 10.4 (defense team constructions), 10.5 (investigation requirements), 10.11 (preparation for penalty phase). And relying on the no-seek notice, the defense made choices about how to handle evidence, made representations about the scope of witness testimony, and made representations to Spurlock about the progression of his case. *See ABA Guidelines*, Guideline 10.9.1 (defense obligations to explore a plea agreement). The Court will not speculate about the extent to which defense counsel or Spurlock himself would have made different decisions if the government had timely disclosed its intention to seek the death penalty. But neither will the Court ignore that a case on a capital track would have involved material differences in defense preparations which cannot be recreated by merely further continuing proceedings.

*Spurlock*, 782 F. Supp.3d at 1011-12.

A related form of prejudice resulting from the government's flip-flopping in this case is the woefully insufficient amount of time that the defense team had to prepare for the mitigation presentation to the Department of Justice after it announced that it was reconsidering the no-seek notice. **Exhibit A ¶¶** 20-22 (declaration of Douglas Ramseur); **Exhibit B ¶¶** 6-9 (declaration of Joseph King); *Cf. Constanza-Galdomez*, 787 F. Supp.3d at 145 ("The CRC [Capital Review Committee] process also occurred without any meaningful opportunity for defense counsel, learned or not, to develop or present a mitigation case. Because the government had represented to Defendants that it would not seek the death penalty, counsel had no reason to investigate or develop such a case. Only three weeks elapsed between the government's first indication that it might change positions and the CRC meeting for these Defendants.").

A distinct type of actual prejudice suffered by Mr. Hue resulting from the government's diametric change in its position about the death penalty is the lost opportunity to have resolved his case with a non-capital plea bargain. In early 2025, the government offered such a plea offer (to a life sentence), which Mr. Hue rejected because it appeared to offer him no benefit whatsoever after the government's no-seek notice. If Mr. Hue and his counsel had then known that the Department of Justice, after the change in administrations, would renege on its no-seek notice,[30]

---

[30] In assessing prejudice resulting from the government's attempted reneging on its no-seek notice, this Court should engage in a ***counterfactual*** assessment of such prejudice – i.e., if the defense had known with certainty at the time of the no-seek notice that the government would seek to renege on it after a new administration assumed office in 2025, would the defense have taken different actions than it did without such knowledge? *Cf. United States v. Hasting*, 461 U.S. 499, 510-11 (1983) ("The [harmless-error] question a reviewing court must ask is this: absent the prosecutor's allusion to the failure of the defense to proffer evidence to rebut the testimony of the victims, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?"); *see also Moore v. State*, 669 N.E.2d 733, 739-40 (Ind. 1996) ("The State bears the burden of proof and, with it, the risk of plausible uncertainty [citing *Chapman v. California*, 386 U.S. 18, 24 (1967)]. [A] reviewing court must consider a ***counterfactual question*** – whether the jury would have convicted the defendant absent the comment, *United States v. Hasting*, 461 U.S. 499, 510-11 (1983) . . . .") (emphasis added); *cf. Wilkinson v. Legal Services Corp.*, 27 F. Supp.2d 32, 63 &

they would have been strongly incentivized for him to accept the government's plea bargain offer before President Trump's inauguration.  **Exhibit A ¶¶** 10-15 (declaration of Douglas Ramseur); **Exhibit B ¶¶** 10-11 (declaration of Joseph King).  *See Hynes v. Tomei*, 237 A.D.2d 52, 55 n.1 (N.Y. App. Div. 1997) (discussing a defendant's differing incentives to plea bargain in a case with a capital charge depending on whether the prosecution is seeking the death penalty), *rev'd on other grounds*, 706 N.E.2d 1201 (N.Y. 1998).

As the court in *Spurlock* noted, Guideline 10.9.1 of the *ABA Guidelines* requires capital defendant attorneys "to explore a plea agreement."  *Spurlock*, 782 F. Supp.3d at 1011-12. Although the court refused to "speculate about the extent to which defense counsel or Spurlock himself would have made different decisions if the government had timely disclosed its intention to seek the death penalty," the court refused to "ignore that a case on a capital track would have involved material differences in defense preparations [including about potentially revolving the case with a plea agreement avoiding the death penalty] which cannot be recreated by merely further continuing proceedings." *Spurlock*, 782 F. Supp.3d at 1011-12.  That lost opportunity in Mr. Hue's case, by itself, is sufficient prejudice requiring the government's October 24, 2025 notice to be stricken.

Finally, with respect to actual prejudice, Mr. Hue has been subject to clearly foreseeable, inhumane treatment caused by the government's attempt to renege on its no-seek notice – particularly after the government filed its October 24, 2025 notice after failing to meet its own publicly-announced June 5, 2025 deadline for stating whether it would seek to renege on its prior no-seek notice.  **Exhibit A ¶** 18 (declaration of Douglas Ramseur) (noting Mr. Hue was aware of

---

n.59 (D.D.C. 1998) (describing harmless-error analysis in another context as a "counterfactual analysis").

the significance of the June 5, 2025 deadline, which passed without the government filing a notice that it would be seeking the death penalty).  Other courts have recognized the significant psychological harm inflicted on a defendant resulting from the prosecution's mere delay in deciding whether to seek the death penalty (when it ultimately decides not to do so).[31]  The government's deliberate conduct here has inflicted an even more inhumane type of psychological trauma.  *See also Constanza-Galdomez*, 787 F. Supp.3d at 146 ("The anxiety [that the three defendants] have experienced is no doubt significant given the government's abrupt change in position.").

As discussed *infra* in Part III.G., such wanton, inhumane conduct by the government violates the Eighth Amendment and should preclude the death penalty.

**D. This Court Should Strike the Government's October 24, 2025 Notice Because "Good Cause" Does Not Exist for Its Filing.**

Assuming *arguendo* that the government's October 24, 2025 notice of intent to seek the death penalty is not untimely under § 3593(a),[32] then § 3593(a) nevertheless requires the October 24, 2025 notice to be stricken for a different reason: the government cannot demonstrate "good

---

[31] *Cf. United States v. Green*, No. 12-CR-83S, 2018 WL 786185, at *11 (S.D.N.Y. 2018) (in dismissing an indictment on speedy trial grounds, the court noted among other factors the "unique anxiety and concern that comes with the looming prospect of the death-penalty, a prejudice not easily measurable and one absent in the majority of criminal cases."), *aff'd sub nom.*, *United States v. Black*, 918 F.3d 243, 265 (2d Cir. 2019) ("Black, Green, and Rodriguez were forced for two years and ten months to worry over whether the government would seek not just their liberty, but their lives. The magnitude of the anxiety and concern incurred by this decision is great, and this consideration weighs heavily in our determination that the delay here prejudiced Defendants-Appellees.").

[32] In Part III.C., Mr. Hue contends that the government's October 24, 2025 notice is untimely under § 3593(a) even, assuming *arguendo*, that it is not categorically prohibited by § 3593(a).  In Part III.D., he alternatively contends that, at the very least, the government must show "good cause" in order to renege on its no-seek notice.

cause" for its amendment to its December 27, 2024 no-seek notice.[33]  As discussed below, this argument is based on the proposition that a no-seek notice followed later by a contrary notice of the government's intent to seek the death penalty at the very least implicates § 3593(a)'s "good cause" requirement.

### 1.  The "Good Cause" Requirement (as Distinct from the Timeliness Requirement)

"[T]he § 3593(a) good cause requirement is distinct from the statute's timeliness requirement . . . ."  *United States v. Le*, 316 F. Supp.2d 343, 348 (E.D. Va. 2004).  The former statutory requirement means what it plainly says: the government must have objectively good reasons for seeking to change its prior § 3593(a) notice.

### 2.  "Good Cause" Must Be Shown in Order for the Government to Seek the Death Penalty After Previously Filing a Formal No-Seek Notice.

At the very least, the "good cause" requirement of § 3593(a) applies when the government seeks to renege on its prior no-seek notice.  *Constanza-Galdomez*, 787 F. Supp.3d at 146-47.  As the court explained:

> The statute seems to contemplate a less dramatic change than the one in this case – the true amendment of a pre-existing death notice.  The government insists that the statute does not say anything about a new death notice, even if a change in position, and that the government is not required to have good cause to entirely change its mind.  True, it is a little dismissive to refer to the momentous switch from a formal no-seek notice to a death notice as a mere "amendment."  But the purpose of Section 3593(a) is to ensure that the government can only change its mind regarding a death notice when there is good cause to do so   If Congress is concerned by the lesser, surely it would also be concerned with the greater.  This Court agrees with Defendants that the principles Congress outlined in Section 3593(a) apply equally to this case.

*Id.*

Similarly, as the court in *Spurlock* held:

---

[33] Section 3593(a) states that a court "may permit the attorney for the government to amend the notice upon a showing of *good cause*." 18 U.S.C. § 3593(a) (emphasis added).

> [T]he Court agrees with Defendant that [§ 3593(a)] must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so. Reading the statute to allow reversal of a no-seek notice without good cause, as the government proposes, would run contrary to the fundamental principles of statutory construction and public policy. Under that reading, the government would be required to show good cause to amend a single aggravating factor under 18 U.S.C. § 3593(a)(2), but would be at total liberty to modify its representations in the far more significant manner – where a defendant's rights and a court's resources are most at stake – by deciding at any time, for any reason, to seek the death penalty, after formally declaring the opposite. This interpretation is nonsensical for many reasons, including because reversal of a no-seek decision involves the noticing of many new aggravating factors, which are clearly the central subject of 18 U.S.C. § 3593(a)(2)'s good cause requirement.

*Spurlock*, 782 F. Supp.3d at 1014; *see also Cole*, 799 F. Supp.3d at 456 ("This Court finds the reasoning of both the *Spurlock* court and the *Constanza-Galdomez* court persuasive and aligned with the purpose of Section 3593 in establishing procedural protections for capital defendants. It simply cannot be – as the Government contends – that the filing of a No-Seek Notice represents a legal nullity, to which the [Federal Death Penalty Act] attaches no significance.");[34] *Dangleben*, 2025 WL 2647195, at *6 ("[T]he statute requires that any amendment of notices to seek the death penalty must be based upon 'good cause.' Because the stakes are much higher when amending a no-seek notice to convert it to a notice to seek the death penalty, the standards for amendment

---

[34] The court in *Cole* further stated that:

> [H]olding that the Government may amend a No-Seek Notice to a Seek Notice without good cause would create an "unworkable and contradictory" outcome, such that "defense counsel and the Court would have to continue to treat every single capital-eligible case as a death case, regardless of an earlier representation that the government would not seek death, lest the government attempt to reverse its decision at the last minute." [*Spurlock*,] 782 F.Supp.3d at 1008. That is precisely the outcome that the FDPA seeks to prevent. Thus, this Court concludes that assuming, without deciding, that the FDPA permits the reversal of a No-Seek Notice into a Seek Notice, Section 3593 requires the Government to demonstrate good cause to do so.

*Cole*, 799 F. Supp.3d at 456.

should be even more applicable when attempting to amend a no-seek notice."); *cf. In re McSweeney*, 209 A.3d 1228, 1231 (Vt. 2019) ("[I]n laws conferring power, the greater authority implies the lesser of the same nature.") (citation and internal quotation marks omitted).

As explained *supra*, § 3593(a) does not explicitly require formal notice of the government's decision *not* to seek the death penalty against a particular defendant facing capital charges. Yet clearly the Department of Justice – as reflected in its *Justice Manual* – believes such notice is implicitly required by § 3593(a). The Department provides such notice "so that the [district] court is aware . . . that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required." *Justice Manual* § 10.150.

The statute's implicit notice requirement concerning no-seek decisions is essential to the fair administration of the federal death penalty as a result of the interplay among 18 U.S.C. §§ 3005, 3593, and 3599(a). Significantly, Congress enacted both § 3593(a) and the current version of § 3005 in the same 1994 legislation. *See* Pub. L. 103-322, Title VI ("Death Penalty"), Sept. 13, 1994, 108 Stat. 1982.[35] Therefore, § 3593(a)'s notice requirement must be interpreted in light of §§ 3005 and 3599(a), which impose special obligations on federal courts in federal death penalty cases. The three statutes, when interpreted holistically, demonstrate congressional intent that the Department of Justice, after capital charges are filed, must give timely notice – *one way or the other* – about its intent to seek the death penalty so as to enable a district court to comply with its special statutory obligations in federal death penalty cases (or to know that such obligations do not exist). *See Pereira v. Sessions*, 585 U.S. 198, 199-200 (2018) (interpreting a statute based in part on how it operated with a "neighboring provision"); *United Sav. Ass'n of Tex. v. Timbers of Inwood*

---

[35] Section 3599(a) was added in a 2006 act. Pub. L. 109-177, Title II, § 222(a), Mar. 9, 2006, 120 Stat. 231.

*Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (stating that statutory interpretation is a "holistic endeavor"). "'[I]n construing [a] statute [a] court should adopt that sense of words which best harmonizes with context and promotes [the] policy and objectives of legislature.'" *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 n.10 (1991) (quoting *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 396 (1868));[36] *United States v. St. Amour*, 886 F.3d 1009, 1014 (11th Cir. 2018) (same). The clear policy of Congress, as reflected in §§ 3005, 3593, and 3599(a), is for the Department of Justice to give a timely notice – one way or the other – concerning whether it intends to seek the death penalty after death-penalty-eligible charges are filed. Otherwise, a court could not meaningfully implement §§ 3005 and 3599(a).

Although the literal language of § 3593(a) refers to "good cause" to amend a notice of intent to *seek* the death penalty, this is one of the rare situations in which "the literal application of

---

[36] In *Hartwell*, the Court stated:

> The object in construing penal, as well as other statutes, is to ascertain the legislative intent. That constitutes the law. If the language be clear it is conclusive. There can be no construction where there is nothing to construe. The words must not be narrowed to the exclusion of what the legislature intended to embrace; but that intention must be gathered from the words, and they must be such as to leave no room for a reasonable doubt upon the subject. It must not be defeated by a forced and over-strict construction. The rule does not exclude the application of common sense to the terms made use of in the act in order to avoid an absurdity, which the legislature ought not to be presumed to have intended.

*Hartwell*, 73 U.S. at 395-96; *see also Johnson v. Baker*, 139 P. 86, 88-89 (Cal. 1914) ("A statute must be construed with reference to the object to be accomplished by it, and in ascertaining such object, it is proper to consider the necessity for its enactment. . . . [W]hatever is necessarily implied in a statute is as much a part of it as that which is expressed."); *Storms v. Stevens*, 463 N.E. 401, 403 (Ind. 1885) ("In the construction of statutes the prime object is to ascertain and carry out the purpose and intent of the legislature. To do this the words used in the statute should be first considered in their literal and ordinary signification. But if, by giving them such a signification, the meaning of the whole statute is rendered doubtful, or is made to lead to contradictions or absurd results, the whole statute must be looked to, and the intent, as collected therefrom, must prevail over the literal import of terms and detached clauses and phrases.").

a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) (citation and internal quotation marks omitted).  If § 3593(a) were interpreted to permit the government to change its mind and pursue the death penalty after previously filing a formal no-seek notice – without having good cause to do so – absurd results could result.  *See, e.g.*, *Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011) ("Because the legislature is presumed to act with sensible and reasonable purpose, a statute should, if at all possible, be read so as to avoid an unjust or absurd conclusion.").

For instance, without a good-cause requirement, the government could change its position a decade or more after filing a no-seek notice.  The latter scenario could occur if the government filed a no-seek notice, the defendant proceeded to a non-capital trial and was convicted (and received a life sentence), but eventually, after first unsuccessfully pursuing a direct appeal, ultimately succeeded in having his murder conviction vacated in a post-conviction proceeding under 28 U.S.C. § 2255 – and only *then* the government changed its mind and decided to seek the death penalty at a retrial.  Permitting the government to change its position by filing a § 3593(a) notice at that juncture surely would be absurd based on the decade of detrimental reliance by the defendant.  In applying the absurdity canon of statutory interpretation to § 3593(a), this Court must consider how a particular interpretation would apply in other cases as well as the instant case.[37] Finally, any question about what § 3593(a) requires or prohibits should be resolved in a defendant's favor under the rule of lenity (particularly when the death penalty is at issue).  *See McNally v. United States*, 483 U.S. 350, 359-360 (1987).

---

[37] *See, e.g.*, *Raila v. United States*, 355 F.3d 118, 123 (2d Cir. 2004); *St. Luke's Hospital Ass'n of Cleveland, Ohio, of Methodist Church v. United States*, 333 F.2d 157, 163-64 (6th Cir. 1964).

The potential for a death sentence creates multiple time-consuming and costly obligations on the part of the federal court system to administer – including locating learned counsel willing to be appointed, appointing a mitigation specialist and other types of specialized experts for capital cases, and creating budgets for extensive travel (e.g., to interview witnesses and for frequent client visits, often in a remote jail).  If a formal notice that the government is *not* seeking the death penalty can be withdrawn without good cause, then the federal judiciary loses its ability to fairly and efficiently administer the various statutory obligations and additional obligations created by the Judicial Conference of the U.S. Courts.  *See* GUIDE TO JUDICIARY POLICY (Vol 7., *Defender Services, Part A Guidelines for Administering the CJA and Related Statutes, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*).

Therefore, even assuming *arguendo* that § 3593(a) does permit the government to change its position after previously filing a no-seek notice, this Court at least must determine whether the government can demonstrate "good cause" for reneging on its prior no-seek notice.[38]  It certainly cannot do so in this case.  The sole basis for the government's diametric change in position on a matter of life and death is a change in administrations and a corresponding change in policies about the death penalty.  That is not "good cause."  Regardless of dramatically differing policy views, the official actions of the former leadership of the Justice Department in a specific case are imputed to the current leadership in a new administration.  *Cf. Giglio v. United States*, 405 U.S. 150, 154 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government.  *See*

---

[38] Even assuming *arguendo* that the statute's good-cause requirement does not apply to a notice to seek the death penalty filed after a prior no-seek notice was filed, this Court should adopt such a requirement under this Court's supervisory authority.  *See supra* note 6.

RESTATEMENT (SECOND) OF AGENCY § 272."); *Santobello v. New York*, 404 U.S. 257, 262 (1971) (attributing one prosecutor's plea-bargain promise to a second prosecutor in the same office who had been unaware of the first prosecutor's promise when the second prosecutor breached the agreement at the defendant's sentencing); *United States v. Carter*, 454 F.2d 426, 427-28 (4th Cir. 1972) (en banc) (holding that a promise made by a federal prosecutor in one judicial district on which a defendant relied is enforceable against a federal prosecutor in a different district). Although the Department of Justice may change its *general* charging and sentencing policies in a new administration and treat *future* litigants differently than litigants in past or pending cases, it may not do so in a specific pending criminal case when a prior formal representation was made and its reversal would prejudice that specific defendant. *See Harris v. City of Philadelphia*, 47 F.3d 1311, 1327 (3d Cir. 1995) ("[T]he election of a new administration does not relieve it of valid obligations assumed by previous administrations. Just as the [new administration] would not have been free to break its contract with a vendor or other contractor because of the election of a new administration, so too changes in administrative policy alone do not permit the [new administration] to unilaterally default on its obligations to the court and other litigants."); *accord U.S. ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County, N.Y.*, 712 F.3d 761, 771 (2d Cir. 2013); *Newman v. Graddick*, 740 F.2d 1513, 1516-17 (11th Cir. 1984).[39]

---

[39] The fact that the no-seek notice was filed towards the end of the prior administration is irrelevant. *Newman*, 740 F.2d at 1517 ("Defendants first argue that [the soon-to-be outgoing prior administration] did not have the authority to bind the incoming administration to the terms of the consent agreement. [Prior administration officials] were parties to this lawsuit when the agreement was signed and were the current officials of the state [at the time of the consent decree]. Since they were the current officials and the parties, they had the authority to sign the consent decree, and to bind the incoming officials.").

**E.  The Government Is Estopped from Seeking the Death Penalty Under 18 U.S.C. § 3593(a).**

In addition to having waived its ability to file a § 3593(a) notice of its intent to seek the death penalty, the government is estopped from doing so.  There are at least three different types of estoppel that apply here – judicial estoppel, equitable estoppel, and promissory estoppel.

**1.  Judicial Estoppel**

For essentially the same reasons that the district courts gave in applying the judicial estoppel doctrine in *Constanza-Galdomez* and *Spurlock*, this Court should hold that the government is judicially estopped from seeking the death penalty against Mr. Hue.

As the court stated in *Constanza-Galdomez*:

> The Supreme Court laid our three factors for courts to consider in *New Hampshire v. Maine*, 532 U.S. 742 (2001): (1) "a party's later position must be clearly inconsistent with its earlier position;" (2) a court must "inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) a court must ask "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

> All three of those factors favor applying judicial estoppel here. A notice of intent to seek the death penalty is the direct opposite of the prior statement by the government that it would not. This Court effectively accepted that statement in managing this case as a non-capital RICO case for its duration. . . . Finally, and most concerning to this Court in this case, allowing the government to reverse course would impose an unfair detriment on the defense.

*Constanza-Galdomez*, 787 F. Supp.3d at 147-48; *accord Spurlock*, 782 F. Supp.3d at 1009; *Suarez*, 801 F. Supp.3d at 876-77.

This Court should reject any argument by the government that its change in position was in good faith and thus should be honored.  "The government cannot play 'fast and loose' with decisions involving life and death." *Constanza-Galdomez*, 787 F. Supp.3d at 148; *accord Spurlock*,

782 F. Supp.3d at 1013.  The government's October 24, 2025 notice is diametrically contrary to the government's prior no-seek notice.  This Court relied on the government's no-seek notice by managing this case as a non-capital case in reliance on the no-seek notice.  *Cf. Spurlock*, 782 F. Supp.3d at 1010 ("The Court has . . . adopted and relied on the July 2024 No-Seek Notice in . . . explicit and implicit ways . . . ."); *accord Constanza-Galdomez*, 787 F. Supp.3d at 148 ("A notice of intent to seek the death penalty is the direct opposite of the prior statement by the government that it would not.  This Court effectively accepted that statement in managing this case as a non-capital RICO case for its duration.").  Finally, the government clearly would derive an unfair advantage and it would impose a corresponding unfair detriment on the defense if the government were not estopped from seeking the death penalty, as discussed *supra* at Part III.C.  *Cf. Spurlock*, 782 F. Supp.3d at 1010; *Constanza-Galdomez*, 787 F. Supp.3d at 148.

## 2. Equitable Estoppel

Equitable estoppel applies when one party has "lull[ed] another into a false security and into a position he would take only because of such conduct."  *Bamba v. W.I. Belvidere, Inc.*, 579 F.2d 1067, 1071 (7th Cir. 1978).  "To establish equitable estoppel it is not necessary that actual fraud be shown.  It is only necessary to show that the person estopped, by his statements or conduct, misled another to his prejudice."  *United States for Use and Benefit of Noland Co. v. Wood*, 99 F.2d 80, 82 (4th Cir. 1938); *accord United States for the Use and Benefit of Humble Oil & Refining Co. v. Fidelity and Casualty Co. of New York*, 402 F.2d 893, 897 (4th Cir. 1968).

"As colleagues at bar and officers of the court, and to ensure the efficient, accurate and just operation of judicial proceedings, counsel must be able reasonably to rely on representations made by fellow counsel in the context of litigation."  *Miranda v. Contreras*, 754 A.2d 277, 281 (D.C. App. 2000).  Based on the government's formal representation made in its no-seek notice, this

Court should apply the equitable-estoppel doctrine as well as the related but distinct judicial-estoppel doctrine. Clearly, when the government filed its no-seek notice, Mr. Hue and his defense team relied to their detriment.

The reasonableness of Mr. Hue's defense team's detrimental reliance on the no-seek notice is underscored by the provisions in the *Justice Manual*,[40] which show that the Department of Justice has long believed that such notice is required by § 3593(a) when the Attorney General decides not to seek the death penalty in a given case. And the *Justice Manual* also explicitly states that a no-seek notice reflects a "final decision" by the Department. *See* JUSTICE MANUAL § 9-10.150.

### 3. Promissory Estoppel

The government's October 24, 2025 notice also should be barred under the promissory-estoppel doctrine. The elements of promissory estoppel are (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise. RESTATEMENT (SECOND) OF CONTRACTS § 90 (1979).

The government's no-seek notice was a "clear and definite promise" that the government would not seek the death penalty; the government had a reasonable expectation that Mr. Hue and his defense team would rely to their detriment on that promise; Mr. Hue and his defense team did in fact so rely to their detriment on the no-seek notice; and the only manner to avoid this detriment is to enforce the government's promise.

---

[40] *See* JUSTICE MANUAL §§ 9-10.030 & 9-10.150.

A "promise" is "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Brown v. New York City Dept. of Educ.*, 755 F.3d 154, 165 (2d Cir. 2014) (defining as "promise" as "a declaration that one will do or refrain from doing something specified") (*quoting Webster's Third New International Dictionary* 1815 (1986)). The government's formal no-seek notice clearly qualified as a "promise" because it was a clear manifestation of an intention to refrain from acting in a specified manner, conveyed in such a way that Mr. Hue and his defense team were entirely justified in understanding that an irrevocable *commitment* not to seek the death penalty had been made. This is particularly true in view of the *Justice Manual* provision quoted *supra* and the fact that the Department of Justice previously had treated its no-seek notices as "final decisions."[41]

***

For these reasons, the government should be estopped from seeking the death penalty.

---

[41] That fact that there was no "consideration" (or mutuality of obligation) does not foreclose the application of the promissory estoppel doctrine. *See, e.g.*, *Merex A.G. v. Fairchild Weston Systems, Inc*., 29 F.3d 821, 824 (2d Cir. 1994) (discussing the history of the promissory estoppel doctrine in the United States); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981). Indeed, by definition, the promissory estoppel doctrine applies when there is lack of consideration or lack of mutuality or for any other reason that precludes an action for breach of contract but where a party has detrimentally relied on another party's promise. *Merex A.G.*., 29 F.3d at 824; *see also Doll v. Grand Union*, *Co*., 925 F.2d 1363, 1372 (11th Cir. 1991) (stating that the "doctrine of promissory estoppel . . . was designed specifically to address cases where [a party] has no legally enforceable rights but has suffered a loss due to reliance on the defendant's promises"); *Promissory Estoppel*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The principle that a promise made without consideration may nonetheless be enforced to prevent injustice if the promisor should have reasonably expected the promisee to rely on the promise . . . . ").

**F.  Permitting the Government to Seek the Death Penalty Would Violate the Fifth Amendment's Due Process Clause.**

Failure to enforce the government's promise would not only result in a severe inequity; it also would violate due process. *Spurlock*, 782 F. Supp.3d at 1023-24; *Dangleben*, 2025 WL 2647195, at *7, n.8; *cf. Commonwealth v. Cosby*, 252 A.3d 1092, 115 (Pa. 2021) (stating that due process is violated "when the decision not to prosecute is unconditional, is presented as absolute and final, or is announced in such a way that it induces the defendant to act in reliance thereupon").

Furthermore, the government's "arbitrary and capricious"[42] conduct in this case – initially giving formal notice that it would *not* seek the death penalty and then reneging on that representation 951 days later (after, in the interim, missing its own publicly-announced deadline of June 5, 2025) – "shocks the conscience" and, thus, violates due process.  *Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999) (en banc) (noting that the "kind of executive conduct that fairly can be said to 'shock the conscience' . . . and be 'fatally arbitrary in the constitutional sense' . . . involves 'abusing [executive] power, or employing it as an instrument of oppression'"); *see also Shaffer v. Heitner*, 433 U.S. 186, 212 (1977) (due process violated when the conduct of the government "offends traditional notions of fair play and substantial justice").

Finally, the circumstances in this case also violate due process in a related but distinct way: the government's unjustifiable, prejudicial delay in seeking the death penalty, particularly after initially explicitly announcing that the government would not seek it, has substantially and irreparably prejudiced Mr. Hue's ability to defend at a capital trial (including, most significantly, at the capital sentencing phase).  *See* Part III.C., *supra.*

---

[42] *United States v. Littrell*, 478 F. Supp.2d 1179, 1192 (C.D. Cal. 2007) (striking the government's "arbitrary and capricious" notice of its intent to seek the death penalty as a violation of due process).

Therefore, this Court should strike the government's October 24, 2025 notice.

### G. Permitting the Government to Seek the Death Penalty Would Violate the Eighth Amendment's Cruel and Unusual Punishments Clause.

It also would violate the Eighth Amendment to permit the government to seek the death penalty in view of its prior explicit statement – in a formal court filing – that it would "**not**" seek the death penalty[43] followed by the government missing its own publicly-announced June 5, 2025 deadline to state whether it would seek the death penalty after all.  What the government has done is both *cruel* (indeed, inhumane) and certainly *unusual*.[44]  Such conduct, at the very least, "wantonly"[45] inflicts psychological trauma in violation of the Eighth Amendment.  *See Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Beal v. Foster*, 803 F.3d 356, 357-38 (7th Cir. 2015) (holding that the Eighth Amendment prohibits unjustified infliction of physical *or* psychological pain; citing *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012)); *cf. United States v. Black*, 918 F.3d 243, 265-66 (2d Cir. 2019) ("We agree with the district court that a significant portion of the prejudice in this case arises from the government's delayed death-penalty decision.  In addition to the psychological effects of pre-trial custody, Black, Green, and Rodriguez were forced for two years and ten months to worry over whether the government would seek not just their liberty, but their lives. The magnitude of the anxiety and concern incurred by this decision is great,

---

[43] As noted *supra*, the government's no-seek notice both underlined and bold-faced "not."

[44] Before the recent policy of the DOJ to reconsider capital cases in which the previous administration had formally disclaimed its intent to seek the death penalty, the DOJ had never engaged in such a diametric change in position.

[45] *Cf. State of La. ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1949) (plurality) (finding no constitutional violation when a convicted capital defendant initially was unsuccessfully electrocuted as a result of an "unforeseeable accident" and thereafter subject to a second execution date; reasoning that there was no "add[ed] . . . element of cruelty" in the subsequently scheduled execution).  What occurred in Mr. Hue's case was not an "unforeseeable accident."  It was *deliberate* conduct by the Department of Justice.

and this consideration weighs heavily in our determination that the delay here prejudiced Defendants-Appellees.").

## CONCLUSION

The legal dispute at issue is not merely about a violation of Mr. Hue's rights. Instead, "[a]t stake is the honor of the government [and] public confidence in the fair administration of justice . . . ." *Carter*, 454 F.2d at 428 (4th Cir.) (en banc); *see also Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970) ("To say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government"); *cf. United States v. Gomez-Olmeda*, 296 F.Supp.2d 71, 73 (D. P.R. 2003) (holding that the "prosecutorial mismanagement [in a capital case] not only implicates the rights of a defendant and transgresses the boundaries of fair play, but also jeopardizes the proper functioning of the judicial system").

As aptly stated by the court in *Constanza-Galdomez*:

> This case presents an unusual and extreme situation because the government has directly contravened its prior representations to the Defendants and this Court. The government asks this Court to treat its belated attempt to seek the death penalty like any other change in a charging document. This Court [should] not cast aside decades of law, professional standards, and norms to accommodate the government's pursuit of its agenda. Of course, elections have consequences, and this administration is entitled to pursue the death penalty in cases where it can do so in accordance with constitutional and statutory requirements. But this is not one of them.

*Constanza-Galdomez*, 787 F. Supp.3d at 146.

For the foregoing reasons, this Court should strike the government's October 24, 2025 notice with prejudice. If the government disputes any of the factual assertions made in this motion and its exhibits, Mr. Hue requests an evidentiary hearing.

Respectfully submitted,

## <u>CERTIFICATE OF CONFERENCE</u>

On January 19, 2026, I conferred with counsel for the government, Assistant U.S. Attorney Brian Samuels, who informed me that the government opposes this motion.

_____/s/_____
Joseph King

## <u>CERTIFICATE OF SERVICE</u>

I certify that, by filing this motion via this Court's CM/ECF system, all counsel of record have been served.

_____/s/_____
Joseph King
