UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA

v.

ANTWAN HUE,

Defendant.

Criminal No. 2:24cr38-01

## ORDER

Pending before the Court are a Motion to Suppress Evidence Related to 2017 Traffic Stop (the "Motion") (ECF No. 110) and a Memorandum on the Scope of Suppression (ECF No. 221) filed by Defendant Antwan Hue ("Defendant" or "Mr. Hue"). The Court held a hearing on the Motion on January 20, 2026. Min. Entry, ECF No. 237. For the reasons that follow, the Motion (ECF No. 110) is **DENIED as moot in part** and **DENIED in part**.

## I.    BACKGROUND OF THE INVESTIGATION

### A.    The Murder of Charlene Ryals: December 4, 2016

On December 4, 2016, intruders entered the home of Charlene Ryals ("Ms. Ryals") in Norfolk, Virginia and shot her multiple times, killing her. Def. Mem. at 6, ECF No. 221 ("Def. Mem."). Ms. Ryals's 9-year-old son, A.H., was present during the shooting and described three individuals, two of whom wore masks. *Id.* Detectives developed multiple theories for the shooting and pursued numerous leads. *Id.* Early in the investigation, they identified Mr. Hue as A.H.'s father and began investigating him as a person of interest in Ms. Ryals's murder. *Id.*

1

During the early stages of the investigation, law enforcement identified and contacted Ms. Ryals's friends and family and searched her electronic devices and social media accounts. *Id.* Notably, detectives recovered DNA evidence with an unknown major contributor from the wooden door handle used to enter Ms. Ryals's home. *Id.* Searches of law enforcement databases in early 2017 did not yield any results for the unknown major contributor, but the DNA profile was preserved for later testing. *Id.* No other suspect DNA profiles were developed from the crime scene. *Id.*

**B.     The 2017 Traffic Stop: February 5, 2017**

On February 5, 2017, Mr. Hue and Regina Chen ("Ms. Chen") were arrested on suspicion of drug trafficking after South Carolina Police Officer Todd Campbell ("Officer Campbell") conducted a late-night traffic stop in Blacksburg, South Carolina (the "2017 Traffic Stop") and found a substance that field-tested positive for cocaine in their rental vehicle. *Id.* at 7. The 2017 Traffic Stop is the subject of the instant Motion. *See generally* Mot., ECF No. 110. Subsequent to the 2017 Traffic Stop, Officer Campbell seized numerous items of evidence from Mr. Hue's vehicle and Mr. Hue and Ms. Chen's persons, including multiple cell phones and laptops. Def. Mem. at 7. South Carolina investigators later secured search warrants and obtained comprehensive data extractions from several of the seized devices, including a white Samsung Galaxy S4 belonging to Mr. Hue. *Id.*

**C.     The Norfolk Police Investigation into Ms. Ryals's Homicide: 2017 to 2019**

Meanwhile, on January 23, 2017, Norfolk investigators indicated that it was a priority of the investigation to "determine Antwan Hue's phone number [t]o execute

2

a search warrant to determine [Mr. Hue's] whereabouts[.]" *Id.* On February 9, 2017, Homicide Detective William Cogswell ("Detective Cogswell") from the Norfolk Police Department learned from the Law Enforcement Information Exchange database that Mr. Hue had been arrested in South Carolina for narcotics charges, pursuant to the 2017 Traffic Stop. *Id.* at 8. On February 12, 2017, Detective Cogswell contacted Officer Campbell about the arrest and informed him that Mr. Hue was a potential suspect in a homicide. *Id.* In follow-up conversations with the South Carolina police, the Norfolk detectives requested information about Mr. Hue and access to evidence seized during the 2017 Traffic Stop, including the contents of the electronic devices. *Id.*

On February 22, 2017, Detective Cogswell received a phone call from Travis Chiles ("Mr. Chiles"), who identified himself as a friend of Mr. Hue. *Id.* Mr. Chiles provided information about Mr. Hue's alleged travels around the time of Ms. Ryals's murder and Mr. Hue's efforts to terminate his child support obligations for A.H. *Id.* Mr. Chiles stated that Mr. Hue and Mr. Hue's girlfriend, whom Mr. Chiles did not know, visited him on December 4 or 5, 2016. *Id.* During that visit, Mr. Hue stated that he planned to speak with Ms. Ryals to see if she would release him from his child support obligations. *Id.*; *see also* Gov't Resp. at 9, ECF No. 225 ("Gov't Resp."). Mr. Chiles also informed Detective Cogswell that Mr. Hue typically contacted him through WhatsApp and had previously communicated using three numbers, ending in -8910, -6223, and -0537. Def. Mem. at 8. Mr. Chiles indicated that the number ending in -8910 was the "most common number Hue used." *Id.*; *see* Gov't Resp. Ex. 1, ECF No. 225-1.

3

On February 24, 2017, Detective Cogswell and another Norfolk detective visited South Carolina and spoke with Officer Campbell. Def. Mem. at 8. The Norfolk detectives observed the evidence seized from the 2017 Traffic Stop, including the electronic and data-storage devices, and interviewed Mr. Hue at the Cherokee County Detention Center.[1] *Id.* On March 2, 2017, the Norfolk detectives visited Mr. Chiles and obtained a statement. *Id.* at 9. Mr. Chiles reiterated his prior statements, adding that Mr. Hue's girlfriend might be named "Kayla." *Id.*

Thereafter, the Norfolk detectives sought and obtained the following search warrants and/or evidence: (1) on March 12, 2017,[2] a search warrant for T-Mobile records for the phone number ending in -6223, over the date range 12/1/2016 to

---

[1] In an April 22, 2025 filing, the Government represented that it will not use Mr. Hue's statements obtained during this interview as part of its case in chief at trial. Notice, ECF No. 190. Based on that representation, the Court denied as moot Defendant's Motion to Suppress Statements (ECF No. 111) and found that "the challenged statements were voluntarily made and therefore may be used for impeachment purposes if Defendant elects to testify at trial." Order at 2, ECF No. 195 (citing *United States v. Gullett*, 75 F.3d 941, 946 (4th Cir. 1996)).

[2] Throughout their briefing on this Motion, the parties sometimes inaccurately state that this search warrant was sought and obtained on March 15, 2017. *See* Def. Mem. at 19 (identifying the search warrant for Mr. Hue's T-Mobile account as the "March 15, 2017 Search Warrant for T-Mobile Records by Norfolk PD"); Gov't Resp. at 7, 8 (responding to Defendant's argument about the "March 15, 2017, T-Mobile search warrant for records related to defendant's phone number"). However, the search warrant, attached as Exhibit 5 to Defendant's Memorandum on the Scope of Suppression, was signed by the magistrate judge on March 12, 2017 at 1:40 p.m. Def. Mem. Ex. 5 at 1, ECF No. 221-5; *see also* Def. Mem. at 9 (indicating that "[o]n March 12, 2017, Norfolk detectives sought and received a search warrant for T-Mobile records related to the phone number ending -6223, over the date range 12/1/2016 to 12/18/2016."); Def. Reply at 1–3, ECF No. 232 (discussing the "March 12, 2017 T-Mobile Warrant"). At the motion hearing, Detective Cogswell testified that he executed the search warrant for the records related to the phone number ending in -6223 on March 12, 2017. Min. Entry, ECF No. 237.

12/18/2016 (the "March 12, 2017 T-Mobile Search Warrant"); (2) on March 13, 2017, evidence from the 2017 Traffic Stop mailed from South Carolina, including a disc containing the data extraction from Mr. Hue's phone; (3) on March 20, 2017, a search warrant for Metro PCS records for the phone number ending in -4050, which the detectives had linked to Kayla Bedessie ("Ms. Bedessie") through Mr. Hue's phone data; (4) on March 22, 2017, a search warrant for records related to Ms. Bedessie's Gmail account, kaylabedessie1@gmail.com; and (5) on April 12, 2017, a search warrant for records related to Mr. Hue's Gmail account, antwanhue@gmail.com. *Id.* at 9–10.

For the next two years, the Norfolk investigation of Ms. Ryals's homicide stalled. *Id.* at 10. In March 2019, T-Mobile and Metro PCS's policy was to retain subscriber information, call detail records, cell-site location information, and SMS toll information for a period of up to two years for pre-paid customers. *Id.* This means that any cell records related to Ms. Ryals's homicide in December 2016 would have expired and become unavailable to law enforcement in December 2018, absent the previous search and seizure of such records. *Id.* at 11.

### D.   A South Carolina State Court Deems the 2017 Traffic Stop Unconstitutional: May 16, 2018

Meanwhile, on May 16, 2018—following a suppression hearing—a South Carolina state court deemed the 2017 Traffic Stop unconstitutional. Gov't Resp. Opp'n at 9, ECF No. 152. It ordered all the evidence obtained from that the 2017 Traffic Stop, and the warrants that followed, suppressed, and the drug trafficking charges against Mr. Hue were dismissed. Def. Mem. at 7. Mr. Hue successfully petitioned for the

return of his property. *Id.* However, the device data extractions were preserved and not destroyed. *Id.*[3]

### E.    A DNA Hit for Zquan Steeps: June 2019 to August 2020

On June 17, 2019, Zquan Steeps ("Mr. Steeps"), a resident of Wilkes-Barre, Pennsylvania, was identified as a match for the unknown DNA profile obtained from Ms. Ryals's wooden door handle in the aftermath of her murder. *Id.* at 11. Mr. Steeps's DNA had entered the national database following his arrest for possession of a firearm by a felon. *Id.* This DNA hit reignited the investigation into Ms. Ryals's homicide.

On July 8, 2019, Detective Cogswell and another Norfolk detective visited Wilkes-Barre to meet with local police and interview Mr. Steeps, who remained in custody on state gun charges. *Id.* Mr. Steeps denied visiting Norfolk and denied any familiarity with Mr. Hue, Ms. Ryals, Ms. Chen, or Ms. Bedessie. *Id.* Following the interview, Wilkes-Barre police applied for a search warrant seeking a DNA buccal swab from Mr. Steeps. *Id.* On September 13, 2019, Mr. Steeps was confirmed to be a 1 in 7.2 billion match to the DNA sample taken from the crime scene of Ms. Ryals's homicide. *Id.*

---

[3] When a suppression motion is litigated in state court, and a similar motion is later litigated in federal court, issue preclusion does not apply because the federal government is not the same party as the state government. *United States v. Safari*, 849 F.2d 891, 893 (4th Cir. 1988) (holding that "prior state court grant of a motion to suppress did not foreclose a federal prosecution arising from the identical set of facts" because "the federal government was not a party in the state court action"). However, in a May 16, 2025 filing, the Government represented that it would "no longer seek to defend the legality of the 2017 traffic stop." Notice, ECF No. 193. Accordingly, the Court assumes, without deciding, that the 2017 Traffic Stop was unconstitutional and considers herein what evidence, if any, must be suppressed as fruit of the poisonous tree.

This break in the case prompted the Norfolk detectives to reanalyze Mr. Hue's phone records, which were obtained and preserved following the 2017 Traffic Stop. *Id.* The goal of the re-analysis was to link Mr. Hue to Mr. Steeps. *Id.* By this point in time, a South Carolina state court had already ordered that the 2017 Traffic Stop was unlawfully extended in violation of Mr. Hue's Fourth Amendment rights and ordered that any evidence obtained as a result of the stop be suppressed. *Id.* at 11. The Norfolk detectives identified location information from the phone records that they believed placed Mr. Hue in Wilkes-Barre on December 2, 2016. *Id.* The detectives also identified a December 3, 2016 call from Mr. Hue's phone to a phone number ending in -7132. *Id.* at 11–12. At that time, the Wilkes-Barre investigators believed that Mr. Steeps had used the -7132 phone number in 2016.[4] *Id.* at 12.

On September 18, 2019, Mr. Steeps was charged with offenses relating to Ms. Ryals's murder. *Id.* On October 1, 2019, the Norfolk detectives sought and received: (1) a search warrant for Mr. Steeps's Gmail account, zsteeps94@gmail.com;[5] and (2) AT&T records relating to the -7132 phone number for the time period 12/1/2016 to 12/10/2016.[6] *Id.* On August 27, 2020, Mr. Steeps was extradited to Norfolk for prosecution. *Id.*

---

[4] This phone number was later linked to an individual named Denasha Campbell. Def. Mem. at 12.

[5] No data was returned for this search warrant due to the requested time frame being four years old. Def. Mem. at 12.

[6] It is unknown whether this warrant was filed. The copy presented to the Court is undated and missing a return. Def. Mem. Ex. 9, ECF No. 221-9; *see* Def. Mem. at 12.

**F.      Mr. Hue is Arrested for Drug Trafficking in Florida: August 2019**

In August 2019, Mr. Hue was arrested and prosecuted in the Southern District of Florida on drug trafficking charges. *Id.* He later pled guilty to Attempt to Possess with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 846, and was sentenced to 27 months of imprisonment. *See* J. at 1–2, *United States v. Hue*, No. 1:19cr20567 (S.D. Fla. Mar. 21, 2022), ECF No. 158. Between March and June of 2022, Homeland Security Agents transferred property and evidence seized during the investigation into Mr. Hue's charges in Florida to the custody of the Norfolk Homeland Security Investigations Office. Def. Mem. at 12.

**G.      The Federal Investigation into Ms. Ryals's Homicide: June 2021 to January 2024**

On June 1, 2021, Federal Bureau of Investigation ("FBI") agents retrieved the Norfolk police homicide case file for Ms. Ryals and digitized it. *Id.* at 13. On November 30, 2021, FBI agents retrieved evidence from the Wilkes-Barre police department. *Id.* In late 2023 and early 2024, federal investigators successfully sought and obtained a number of search warrants for electronic records held by third-party businesses, including but not limited to a June 29, 2023 Facebook search warrant for records related to seven accounts,[7] a December 7, 2023 Google search warrant for records related to ten accounts,[8] and a January 19, 2024 Google search warrant for records

---

[7] Search Warrant, *United States v. SEALED*, No. 2:23sw123 (E.D. Va. June 29, 2023), ECF No. 4.

[8] Search Warrant, *United States v. SEALED*, No. 2:23sw213 (E.D. Va. Dec. 7, 2023), ECF No. 4.

related to ten accounts[9] (collectively, the "2023 and 2024 Social Media Search Warrants"). *Id.* at 13; Gov't Resp. at 11.

## II.   PROCEDURAL HISTORY

### A.   The Instant Criminal Charges Against Mr. Hue

On May 8, 2024, an indictment was filed against Mr. Hue and four co-defendants—Ms. Chen, Ms. Bedessie, Mr. Steeps, and Deshawn Mercer ("Mr. Mercer"). Indictment, ECF No. 3. The indictment charges Mr. Hue with Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. §§ 1958 and 2 (Count 1), Murder for Hire, in violation of 18 U.S.C. §§ 1958 and 2 (Count 2), Murder While Engaged in a Drug Trafficking Offense, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 848(e)(1)(A) and 18 U.S.C. § 2 (Count 3), and Conspiracy to Manufacture, Distribute and Possess with Intent to Manufacture and Distribute Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A) (Count 4). *Id.* Mr. Hue is potentially subject to the death penalty and has been detained since his arrest. *See* Warrant, ECF No. 70 (indicating that Mr. Hue was arrested on June 4, 2024); Order, ECF No. 72 (ordering Mr. Hue detained pending trial); Notice, ECF No. 223 (stating the Government's intent to seek the death penalty against Mr. Hue).[10]

---

[9] Search Warrant, *United States v. SEALED*, No. 2:24sw8 (E.D. Va. Jan. 19, 2024), ECF. No. 4.

[10] On December 27, 2024, the Government indicated that it would "**not** seek a sentence of death against [Mr. Hue] for any of the offenses for which he is charged in criminal case number 2:24-cr-38." Notice, ECF No. 157. On October 24, 2025, the Government reversed its position and provided that, in the event of a conviction of Mr. Hue in this case, it would seek a sentence of death. Notice, ECF No. 223. This second notice (ECF No. 223) is the subject of pending litigation. *See* Mot., ECF No.

## B.   The Motion to Suppress and Supplemental Briefing

On September 30, 2024, Defendant filed the instant Motion. Mot., ECF No. 110. Therein, he moves to suppress "all evidence obtained or derived from" the 2017 Traffic Stop. *Id.* at 1. In support of his Motion, Defendant argues that the South Carolina police: (1) extended the 2017 Traffic Stop without reasonable suspicion, in violation of the Fourth Amendment; (2) searched Mr. Hue's vehicle without probable cause or valid consent; and (3) interrogated Mr. Hue at length before advising him of his *Miranda* rights. *See generally id.* The bulk of the Motion argues that the South Carolina police unlawfully prolonged Mr. Hue's detention during the 2017 Traffic Stop and urges this Court to follow the South Carolina state court's ruling in Mr. Hue's favor by finding that the stop was unlawfully extended in violation of his Fourth Amendment rights. *Id.* at 6–14.

On November 25, 2024, the Government filed a response in opposition to the Motion, ECF No. 152, and on December 20, 2024, Defendant filed a reply, ECF No. 156. A hearing on the Motion was set for May 20, 2025. Then, days before the hearing, on May 16, 2025, the Government filed a notice indicating that it would no longer seek to defend the legality of the 2017 Traffic Stop. Notice, ECF No. 193 (requesting that the Court render the Motion moot, strike the motion hearing, and permit the parties to submit additional briefing to determine what evidence constitutes "fruit of the poisonous tree"); *see also* Def. Resp., ECF No. 194 (arguing that the Court should

---

235 (Mr. Hue's Motion to Strike the Government's Notice of Intent to Seek the Death Penalty); Resp. Opp'n, ECF No. 239; Reply, ECF No. 240.

grant the Motion instead of rendering it moot). On May 19, 2025, the Court entered an Order striking the hearing, deferring ruling on the Motion, and directing the parties to confer and submit a proposed briefing schedule on the remaining issues relating to the suppression of evidence derived from the 2017 Traffic Stop. Order, ECF No. 195.

On May 30, 2025, the Court entered a briefing schedule on the scope of suppression. Order, ECF No. 196. However, shortly thereafter, on June 23, 2025, the Office of the Federal Public Defender ("FPD") moved to withdraw as counsel for Mr. Hue due to an irreconcilable conflict that had arisen between counsel and Mr. Hue.[11] Mot., ECF No. 197. In light of the issues with counsel, the parties moved to suspend the briefing schedule on the scope of suppression, ECF No. 199, and the Court granted that request, ECF No. 201. On August 6, 2025, Attorney Joseph King was appointed as learned counsel for Mr. Hue pursuant to the Criminal Justice Act. On September 24, 2025, the Court entered a revised briefing schedule. Order. ECF No. 220.

Thereafter, on October 10, 2025, Defendant filed his Memorandum on the Scope of Suppression. Def. Mem. Therein, Defendant identifies four discrete categories of evidence that he argues are causally connected to the 2017 Traffic Stop: (1) evidence seized as a direct result of the 2017 Traffic Stop; (2) evidence obtained via search warrants that relied on illegally seized evidence from the 2017 Traffic Stop;

---

[11] The FPD was part of Mr. Hue's initial counsel team, with Assistant Federal Public Defender Amy Austin serving as learned counsel. On October 15, 2024, Attorney Douglas Ramseur was appointed to serve as co-counsel pursuant to the Criminal Justice Act. After the FPD withdrew, Mr. Ramseur was the only remaining member of Mr. Hue's defense team.

11

(3) evidence obtained via subpoenas issued based on information derived from the 2017 Traffic Stop; and (4) witness statements obtained using information derived from the 2017 Traffic Stop. *See generally id.*

On November 10, 2025, the Government filed a response to Defendant's Memorandum on the Scope of Suppression. Gov't Resp. Therein, the Government contends that it "does not intend to offer in its case in chief multiple categories of evidence, rendering moot any motion to suppress those items." *Id.* at 5. Instead, it indicates that there are four remaining disputed warrants from which the Government does intend to introduce evidence. *Id.* at 7–8. On December 12, 2025, Defendant filed a reply. Reply, ECF No. 232. On January 20, 2026, the Court held a hearing on the Motion. Min. Entry, ECF No. 237. The Motion is fully briefed and ripe for adjudication.

### C.   The Evidence at Issue

#### 1.   *Evidence that the Government Will Not Introduce in its Case in Chief*

The parties agree that the Government will not introduce the following evidence in its case in chief:

1.  Evidence seized as a direct result of the 2017 Traffic Stop
    a.   Samsung Galaxy S4, white, #R38F70BY82A, including data on device (Mr. Hue's cell phone)
    b.   Apple iPad, gray, #DOTLR6N1FCM5, including data on device
    c.   Apple MacBook, #C1MM2E777OTY3, including data on device
    d.   Dell laptop, #FJNQQ1, including data on device
    e.   PNY 16 GB USB drive, including data on device
    f.   PNY 128 GB USB drive, including data on device
    g.   Data Traveler 2GB USB drive, including data on device
    h.   Jamaica Tours USB drive, including data on device

12

i. Digicel 4GB USB drive, including data on device
j. Currency (USD & JMD)
k. Two checkbooks
l. USAA Mastercard ending -3510
m. Navy Federal Credit Union card ending -4571
n. Visa debit card ending -2287
o. USAA ATM card ending -9281
p. USAA Mastercard ending -8653
q. Visa card ending -7638
r. USAA Visa credit card ending -3657
s. Netspend Visa ending -6582
t. Visa card ending -3040
u. Visa card ending -7642
v. All physical/paper documents, including those contained in brown and yellow folders
w. Two Digicel SIM cards, including data on the devices
x. Domino's delivery receipt
y. Clothing
z. Bags
aa. Buccal swabs collected from Mr. Hue
bb. 422.4 grams of cocaine
cc. Apple iPhone 6S, silver, model A1633, including data on device
dd. Jamaica National MultiLink card ending -3114
ee. Chase debit ending -3110
ff. ID for Ms. Chen
gg. Buccal swabs from Ms. Chen
hh. Jamaican passport for Mr. Hue
ii. Jamaican driver's license for Mr. Hue
jj. 2x IDs for Mr. Hue

2. Evidence from the February 13, 2017 search warrant for Mr. Hue's phone and electronics
3. Evidence from the March 3, 2017 Navy Federal Credit Union search warrant
4. Evidence from the March 28, 2017 search warrant for Ms. Chen's phone
5. Evidence from the April 10, 2017 Google search warrant for records related to Ms. Bedessie's email address
6. Evidence from the April 12, 2017 Google search warrant for records related to Mr. Hue's account
7. Evidence from the 2019 AT&T search warrant for records related to Mr. Mercer's phone number
8. Evidence from the December 7, 2023 Meta search warrant for records related to five accounts (2:23sw212)

9. Evidence from the December 7, 2023 Snap, Inc. search warrant for records related to five accounts (2:23sw211)
10. Evidence from the June 29, 2023 search warrant (2:23sw123) for records related to Ms. Chen's Facebook account ending -20072
11. Evidence from the December 7, 2023 search warrant (2:23sw213) for records related to AntwanHue@gmail.com and Regina.chen89@gmail.com

Attachment A[12]; *see also* Def. Mem. at 15; Gov't Resp. at 5–7. Accordingly, the Motion is **DENIED as moot** with respect to this evidence. *See, e.g., United States v. Neville*, No. 3:24cr183, 2025 WL 2696992, at *1 n.1 (E.D. Va. Sept. 22, 2025) (noting that "[b]ased on the Government's representation that it will not seek to introduce or use any of these statements at trial . . . the Court denied Defendant's *Miranda* Motion as moot."); *United States v. Shah*, No. 5:13cr328, 2015 WL 72118, at *1 (E.D.N.C. Jan. 6, 2015) ("[T]he government has affirmed that it will not attempt to introduce in its case in chief the statements or conduct noted in defendant's motion to suppress asserting violations of the Fifth Amendment . . . Accordingly, defendant's motion is denied without prejudice, on the ground of mootness.").

### 2. Contested Evidence

The Government seeks to admit evidence from the following warrants, which Defendant argues are fruits of the unlawful 2017 Traffic Stop: (1) the March 12, 2017 T-Mobile Search Warrant for records related to Mr. Hue's phone number ending in -6223; and (2) the 2023 and 2024 Social Media Search Warrants, which include the

---

[12] At the motion hearing, the Court requested that the parties provide the Court with a signed list of evidence that the Government will not introduce in its case in chief. Min. Entry, ECF No. 237. The list of evidence, signed by counsel for Defendant (Douglas Ramseur and Joseph King) and the Government (Joseph DePadilla and Brian Samuels), was subsequently provided to the Court via email and is attached to this Order as Attachment A.

June 29, 2023 Facebook search warrant for records related to seven accounts, the December 7, 2023 Google search warrant for records related to 10 accounts, and the January 19, 2024 Google search warrant for records related to 10 accounts. Gov't Resp. at 7–8; Def. Reply at 1–6, ECF No. 232. Defendant additionally argues that any subpoenas issued and witness statements obtained based on illegally obtained information derived from the 2017 Traffic Stop should be suppressed. Def. Reply at 6, ECF No. 232.

## III.   LEGAL STANDARDS

### A.   The Fourth Amendment and the Exclusionary Rule

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007). To protect this right and deter future Fourth Amendment violations, courts apply the exclusionary rule, which bars the use of evidence obtained in violation of the Fourth Amendment in criminal proceedings against the victim of the illegal search and seizure. *Elkins v. United States*, 364 U.S. 206, 223–24 (1960); *United States v. Small*, 944 F.3d 490, 501 (4th Cir. 2019).

The burden of proof is on the party seeking to suppress evidence. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). If the defendant establishes a basis for his motion to suppress, the burden is shifted to the government to prove the admissibility of the evidence by a preponderance of the evidence. *United States v.*

*Seerden*, 264 F. Supp. 3d 703, 708 (E.D. Va. 2017) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986) and *United States v. Matlock*, 415 U.S. 164, 178 (1974)).

### B. *Wong Sun* and its Progeny

The usual remedy in a criminal case for a Fourth Amendment violation is the suppression of evidence obtained during the illegal search or seizure. *Mapp v. Ohio*, 367 U.S. 643, 648 (1961). To effectuate the Fourth Amendment, courts suppress not only the evidence directly obtained during an illegal search or seizure, but also derivative evidence deemed "fruit of the poisonous tree," if the defendant shows the requisite factual nexus between the illegality and the challenged evidence. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963); *see also Segura v. United States*, 468 U.S. 796, 804 (1984) (explaining that the exclusionary rule reaches "evidence obtained as a direct result of an illegal search or seizure and evidence "found to be a derivative of an illegality.").

However, not all evidence discovered as a result of a Fourth Amendment violation is considered "fruit of the poisonous tree" and necessarily inadmissible at trial. *United States v. Gaines*, 668 F.3d 170, 173 (4th Cir. 2012). The Fourth Circuit has recognized that "a direct, unbroken chain of causation is necessary, but not sufficient to render derivative evidence inadmissible." *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002). Instead, suppression requires "unattenuated causation." *Hudson v. Michigan*, 547 U.S. 586, 594 (2006). Therefore, the exclusionary rule does not apply in certain scenarios where law enforcement would have discovered the challenged

evidence regardless of whether the preceding Fourth Amendment violation had occurred. *Id.* at 592.

The central inquiry in so-called "fruits" cases is "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488 (citation and internal quotation marks omitted). Accordingly, determining whether evidence is tainted fruit requires a two-step analysis. *Gray*, 491 F.3d at 154. First, the defendant must show that the challenged evidence was obtained by exploitation of an unlawful search or seizure—that is, that it is causally connected to the primary illegality. *Id.* If the defendant makes this threshold showing, the burden shifts to the government to demonstrate that the evidence was nonetheless obtained by means sufficiently distinguishable to purge the primary taint. *See Wong Sun*, 371 U.S. at 488. The government may satisfy this burden by establishing that the evidence (1) would have been inevitably discovered, *see Nix v. Williams*, 467 U.S. 431, 443–44 (1984), (2) was discovered from an independent source, *see Murray v. United States*, 487 U.S. 533, 537 (1988), or (3) is sufficiently attenuated from the primary illegality so as to dissipate the taint of the unlawful conduct, *see Utah v. Strieff*, 579 U.S. 232, 238 (2016).

### 1.    *The Inevitable Discovery Doctrine*

Evidence "is admissible pursuant to the inevitable discovery doctrine only '[i]f the prosecution can establish by a preponderance of the evidence that the information

ultimately or inevitably would have been discovered by lawful means.'" *United States v. Alston*, 941 F.3d 132, 137 (4th Cir. 2019) (quoting *Nix*, 467 U.S. at 444). "Inevitable discovery demands that the prosecution prove by a preponderance of the evidence: first, that police legally *could* have uncovered the evidence [by lawful means]; and second, that police *would* have done so." *Id.* at 138 (citing *inter alia, United States v. Allen*, 159 F.3d 832, 840 (4th Cir. 1998)).

### 2.      The Independent Source Doctrine

"[T]he independent source doctrine . . . provides for the admissibility of evidence if it would have been obtained even absent an illegal search." *United States v. Bullard*, 645 F.3d 237, 244 (4th Cir. 2011) (citing *Murray*, 487 U.S. at 542). "[T]o conclude that a later search conducted pursuant to a warrant was independent of an earlier, unlawful search, two findings must be made: first, that officers 'did not include in their application for warrant any recitation of [their earlier unlawful observations]' and second, that they 'would have sought a warrant' even if they had not conducted the unlawful search." *Id.* (quoting *Murray*, 487 U.S. at 543) (additional citation omitted). Ultimately, the question "is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue." *Murray*, 487 U.S. at 542.

### 3.      The Attenuation Doctrine

"Where there is sufficient attenuation between the unlawful search and the acquisition of evidence, the 'taint' of that unlawful search is purged." *Gaines*, 668 F.3d at 173. To determine whether derivative evidence has been purged of the taint of the

unlawful search, courts consider several factors, including: "(1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Id.* (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)). Nevertheless, a district court can only make a finding with respect to attenuation after careful consideration of the unique facts and circumstances of the case. *United States v. Seidman*, 156 F.3d 542, 548 (4th Cir. 1998) (citations omitted); *see also Strieff*, 579 U.S. at 238 ("Evidence is admissible when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" (citation omitted)).

## IV.   ANALYSIS

This Motion is before the Court to determine the scope of suppression, following the Government's decision to not defend the legality of the 2017 Traffic Stop. As noted above, the remaining challenges concern the admissibility of: (1) the March 12, 2017 T-Mobile Search Warrant; (2) the 2023 and 2024 Social Media Search Warrants; and (3) any potentially tainted subpoenas or witness statements. The Court addresses each item in turn.

### A.   The March 12, 2017 T-Mobile Search Warrant

First, the Government seeks to introduce evidence obtained from the March 12, 2017 T-Mobile Search Warrant for records related to Mr. Hue's phone number

19

ending in -6223. Gov't Resp. at 8. This warrant was applied for and obtained by Detective Cogswell of the Norfolk Police Department during his initial investigation of Ms. Ryals's murder. *Id.* at 8–9. On February 22, 2017, approximately 10 weeks after Ms. Ryals's murder, Mr. Chiles called Detective Cogswell and provided three phone numbers that he regularly used to contact Mr. Hue, which ended in -8910, -5037, and -6223. *Id.* Shortly thereafter, on February 28, 2017, Detective Cogswell received information from Officer Campbell that a phone associated with the number ending in -6223 was found during Mr. Hue's arrest pursuant to the 2017 Traffic Stop.

Based on this information, Detective Cogswell sought and obtained a search warrant for call-log and location information from T-Mobile related to the -6223 number for early-to-mid December 2016. *Id.* The affidavit submitted with the warrant application contained some information derived from the 2017 Traffic Stop, as well as some information from Detective Cogswell's conversation with Mr. Chiles. *Id.* at 9–10. The Government argues that evidence derived from this warrant is admissible by operation of the independent source doctrine, the inevitable discovery doctrine, or both. *Id.* at 10. Defendant argues that both doctrines are inapplicable and maintains that evidence derived from this warrant should be suppressed as fruit of the unlawful 2017 Traffic Stop. Def. Reply at 1–3, ECF No. 232. For the following reasons, the Court finds that the evidence obtained from the March 12, 2017 T-Mobile Search Warrant is admissible under both doctrines.

### 1.    *Independent Source*

Under the independent source doctrine, the Government must establish that (1) the decision to seek the warrant was not prompted by illegally obtained evidence; and (2) the magistrate's probable cause determination did not rely on information obtained from the illegal search. *Bullard*, 645 F.3d at 244 (citing *Murray*, 487 U.S. at 543).

#### a.    *The Decision to Seek the Warrant Was Not Prompted by Illegally Obtained Evidence*

First, the Court must consider whether Detective Cogswell's decision to seek the March 12, 2017 T-Mobile Search Warrant was prompted by the unlawful 2017 Traffic Stop. Detective Cogswell unequivocally testified at the hearing that he learned from an independent source that the phone number ending in -6223 was associated with Mr. Hue—prior to obtaining that number from the South Carolina police—and it was his standard procedure to develop phone records for every suspect in a homicide investigation. Specifically, Detective Cogswell testified that he was assigned to Ms. Ryals's homicide investigation on February 6, 2017, and given the directive to work on the case "in [his] time permitting," considering that he was lead detective on 17 other homicides that year. He worked on Ms. Ryals' homicide investigation "when [he] could."

In the early stages of the investigation, as was his routine practice, Detective Cogswell began interviewing close friends and family of Ms. Ryals to develop an investigative pathway. Through these interviews, he identified Mr. Hue as the father of Ms. Ryals's son, A.H., and realized Mr. Hue had not yet been interviewed.

21

Therefore, it became a priority of the investigation to contact and interview Mr. Hue because of his relationship to Ms. Ryals and A.H.—Mr. Hue was not necessarily considered a suspect at this time. Detective Cogswell searched the law enforcement database and learned that Mr. Hue had been arrested on February 5, 2017 in Blacksburg, South Carolina. He called the Cherokee County Detention Center and confirmed that Mr. Hue was still detained there.

On February 13, 2017, the Norfolk detectives sent a request for information to the Cherokee County Detention Center, hoping to receive any information related to Mr. Hue's arrest. According to Detective Cogswell, it is standard practice for responses to such requests to take many weeks or even months. On February 22, 2017, Mr. Chiles, who identified himself as a friend of Mr. Hue, contacted Detective Cogswell. Mr. Chiles indicated that Mr. Hue had visited him in Maryland on the day before Ms. Ryals's murder. According to Mr. Chiles, Mr. Hue stated that he was on his way to Norfolk to confront his child's mother because he no longer wanted to pay child support. A few days later, Mr. Hue told Mr. Chiles that Ms. Ryals had been murdered, which Mr. Chiles found concerning in light of their prior conversation. Mr. Chiles provided Detective Cogswell with three phone numbers that Mr. Chiles had used to contact Mr. Hue, ending in -8910, -0537, and -6223, and indicated that the number ending in -8910 was most commonly used by Mr. Hue. After his interview with Mr. Chiles, Detective Cogswell believed Mr. Hue to be a strong suspect with a considerable motive.

On February 24, 2017, Detective Cogswell went to South Carolina to interview Mr. Hue at the Cherokee County Detention Center. On February 28, 2017, Officer Campbell from the Blacksburg Police Department contacted another Norfolk detective and indicated that a phone using the -6223 number was found during Mr. Hue's arrest pursuant to the 2017 Traffic Stop. On March 12, 2017, Detective Cogswell applied for a search warrant for records from T-Mobile relating to only the -6223 phone number. He never applied for warrants for the -8910 or -0537 phone numbers, despite Mr. Chiles' statement that the -8910 number was most commonly used by Mr. Hue.

Detective Cogswell testified that, in every homicide investigation he worked on, it was his routine practice to identify potential suspects' phone numbers and obtain their phone records, as those records can reveal communications and connections that can open additional investigative pathways. He further testified that he did not apply for search warrants for all three phone numbers provided by Mr. Chiles immediately after receiving such numbers because he was only working on this case "as time permits," and he was not able to get to it earlier. When he received the results of the warrant, on March 13, 2017, such records revealed information suggesting that the -6223 number was a "primary phone" for Mr. Hue. It had location data and communications which indicated that this phone was on Mr. Hue's person at the time of the homicide. The location records on that phone also placed Mr. Hue in Florida at the time of Ms. Ryals's murder, as Mr. Hue had claimed, so these phone records only purported to confirm Mr. Hue's alibi and did nothing to enhance the investigation at that time.

On this record, the Court concludes that Detective Cogswell's decision to obtain the March 12, 2017 T-Mobile Search Warrant was not prompted by illegally obtained evidence pursuant to the 2017 Traffic Stop. Rather, Detective Cogswell identified the -6223 number from an independent source, Mr. Chiles, and considered Mr. Hue to be a suspect at that time. He would have sought a search warrant for this number regardless of the information that he received from the South Carolina officers about this number. It is of no consequence that Detective Cogswell received two additional phone numbers from Mr. Chiles and did not ultimately seek warrants for those numbers. Detective Cogswell explained, considering the time he was able to dedicate to this investigation, that he was unable to apply for search warrants for all three numbers provided by Mr. Chiles immediately after receiving those numbers. Then, after receiving the results from the March 12, 2017 T-Mobile Search Warrant, Detective Cogswell did not think it was necessary to apply for search warrants for the -8910 and -0537 phone numbers. However, had he not received any information about the -6223 number from the South Carolina officers, it would have been within his routine practice to apply for search warrants for all three numbers provided by Mr. Chiles, including the -6223 number. That Detective Cogswell prioritized obtaining a warrant for the -6223 number based on the information he received from the South Carolina officers does not indicate that his decision to seek the March 12, 2017 T-Mobile Search Warrant was prompted by illegally obtained evidence. *Bullard*, 645 F.3d at 244.

In sum, there is substantial evidence that Detective Cogswell's decision to seek the March 12, 2017 T-Mobile Search Warrant was not prompted by the unlawful 2017

24

Traffic Stop. Accordingly, the first factor is readily satisfied. *See, e.g., id.* (affirming application of the independent source doctrine where "the record reflect[ed] the officers' intent to seek a search warrant from the outset."); *United States v. Dawson*, 305 F. App'x 149, 162 (4th Cir. 2008) (same where the district court found "that most likely the [officers] made their decision to seek the warrant before the results of any illegal search and not because of any illegal search."); *United States v. Hernandez*, No. 3:14cr111, 2015 WL 13227857, at *5 (W.D.N.C. Dec. 11, 2015) (same where there was "ample evidence . . . that agents would have sought a search warrant for the wireless phone in question absent the [unlawful] search performed in reliance on [the defendant]'s consent.").

      b.     *The Magistrate's Probable Cause Determination Did Not Rely on Information Obtained from the 2017 Traffic Stop*

Next, the Court considers whether the magistrate judge issued the March 12, 2017 T-Mobile Search Warrant based on information obtained from the 2017 Traffic Stop. Illegally obtained evidence cannot be used to secure a search warrant. So, evidence obtained pursuant to a subsequent warrant that relied on tainted evidence must be suppressed unless "sufficient untainted evidence was presented in the warrant affidavit to establish probable cause," rendering the warrant valid. *United States v. Karo*, 468 U.S. 705, 719 (1984); *see also United States v. Allen*, 631 F.3d 164, 173 (4th Cir. 2011); *United States v. Gillenwaters*, 890 F.2d 679, 682 (4th Cir. 1989). In these circumstances, courts excise from the warrant application all unconstitutionally obtained information and determine whether probable cause still exists to support the warrant. *Gillenwaters*, 890 F.2d at 682. The relevant inquiry is "whether the

25

search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence" obtained in violation of the Fourth Amendment. *Murray*, 487 U.S. at 542. Here, the affidavit supporting the March 12, 2017 T-Mobile Search Warrant states in full as follows:

> *On December 4, 2016 at 2039 hours' police and paramedics responded to 570 Garren Avenue, in the City of Norfolk, Virginia, on a report of a gunshot victim. The victim was identified as Charlene Ryals and was found to be suffering from numerous gunshot wounds. Ryals was transported to Sentara Norfolk General Hospital by medics. Ryals was pronounced deceased at Sentara Norfolk General Hospital at 2248 hours by Dr. Novosel. During autopsy, it was determined by Medical Examiner Dr. Kinnison that Ryals died as a result of multiple gunshot wounds.*
>
> *The victim's nine year old son, [A.H.], was present during the shooting and stated a black female knocked on the door asking if she could use the phone as her car broke down. As Ryals opened the door to let the female use the phone a black male and another female rushed inside the residence wearing masks. The black male fired seven rounds at the victim and then fled the location.*
>
> *Travis Chiles, friend of Antwan Hue contacted Norfolk homicide detectives and advised that Antwan Hue was at Chiles residence in Maryland earlier the same day that Ryals was killed. Chiles stated Antwan Hue advised Chiles that he had just returned from New York and that he was on his way to Norfolk, Virginia to confront Ryals about their child support agreement. Chiles stated to detectives that he found it odd Hue would have mentioned this and then Ryals was killed later that same day. Antwan Hue is the father of nine year old [A.H.].*
>
> Antwan Hue was arrested on narcotics charges in February of 2017 and at the time of arrest Hue was in the possession of a cell phone that had a cell number 954-305-6223. *This phone number was confirmed to be a T-Mobile account through contact with T-Mobile by this affiant. Phone records would help to ascertain Antwan Hue's location during the time and date of the homicide as well as any travel to or from the Norfolk, Virginia area prior to and after the homicide. It is known to this affiant that most people carry their cellular phones on their persons while traveling.*
>
> This affiant interviewed Antwan Hue at the Cherokee County Correctional Center in South Carolina. During that interview Hue advised this

affiant that he was in Orlando from October 2016 through December 17, 2016. Hue stated on December 17, 2016 he did travel to Norfolk, VA to sign paperwork at the juvenile and domestic relations office.

*The record of these phone calls and locations are routinely used as evidence in homicide prosecutions because of their probative nature to confirm or dispel witness or suspect statements.*

Def. Mem. Ex. 5 at 2–3, ECF No. 221-5 (emphasis added to statements not derived from the 2017 Traffic Stop). The parties agree that the following statements in the affidavit were derived from the 2017 Traffic Stop: "Antwan Hue was arrested on narcotics charges in February of 2017 and at the time of arrest Hue was in the possession of a cell phone that had a cell number 954-305-6223 . . . This affiant interviewed Antwan Hue at the Cherokee County Correctional Center in South Carolina. During that interview Hue advised this affiant that he was in Orlando from October 2016 through December 17, 2016. Hue stated on December 17, 2016 he did travel to Norfolk, VA to sign paperwork at the juvenile and domestic relations office." *Id.*

This information is not crucial to the affidavit. After excising this illegally obtained information, the remaining statements, including Mr. Chiles's independent identification of the -6223 number as discussed *supra*, present facts such that any reasonable magistrate judge would have found sufficient probable cause to issue a warrant. *See, e.g., United States v. Walton*, 56 F.3d 551, 554 (4th Cir. 1995) (holding that "although the information obtained during the unlawful entry was presented to the magistrate in the search warrant application, that information did not affect the magistrate's decision to issue the warrant"); *United States v. David*, 943 F. Supp. 1403, 1415 (E.D. Va. 1996) (finding that, "after excising the alleged tainted information from the search warrant affidavit, and assuming that the remainder of the

27

police investigation was wholly independent of the taint, probable cause would have existed for the issuance of the warrant.").

*     *     *

In sum, Detective Cogswell's decision to apply for the March 12, 2017 T-Mobile Search Warrant was not prompted by his conversations with the South Carolina police officers, and the affidavit still establishes sufficient probable cause even after excising the illegally obtained information. Therefore, any evidence obtained from the March 12, 2017 T-Mobile Search Warrant is admissible under the independent source doctrine.

### 2.     *Inevitable Discovery*

Alternatively, the Government argues that the evidence obtained from the March 12, 2017 T-Mobile Search Warrant is admissible under the inevitable discovery doctrine. The Court agrees for the reasons that follow. Under the inevitable discovery doctrine, the Government must show that (1) investigators could have obtained the evidence from lawful means; and (2) investigators would have done so. *Alston*, 941 F.3d at 139 (quoting *Nix*, 467 U.S. at 444).

### a.     *Investigators Could Have Lawfully Obtained the Search Warrant*

As to the first factor, as discussed *supra*, investigators could have established probable cause for this warrant based primarily on information provided by Mr. Chiles, and without relying on any unlawfully obtained information. Therefore, the Court finds this factor easily satisfied.

28

b.      *Absent the Unlawfully Obtained Information, Investigators Would Have Applied for this Search Warrant*

Next, absent any unlawfully obtained information derived from the 2017 Traffic Stop and the Norfolk investigators' related conversations with South Carolina police, the Court finds that Detective Cogswell *would have* applied for the March 12, 2017 T-Mobile Search Warrant. As discussed *supra*, it was Detective Cogswell's routine practice to develop phone records of a suspect in every homicide investigation he worked on. Following his February 22, 2017 conversation with Mr. Chiles, Detective Cogswell considered Mr. Hue to be a suspect in Ms. Ryals' homicide. Therefore, it would have been standard procedure for Detective Cogswell to seek search warrants for all three numbers provided by Mr. Chiles as purportedly associated with Mr. Hue, including the -6223 phone number.

Moreover, at the hearing, Detective Cogswell testified that, if he had not received any information about the -6223 phone number from Blacksburg, the "only logical [next] step" would have been to apply for search warrants for all three phone numbers provided by Mr. Chiles, including the -6223 phone number. However, because the results of the March 12, 2017 T-Mobile Search Warrant indicated that the -6223 phone number was likely Mr. Hue's primary number at the time of Ms. Ryals's murder and confirmed Mr. Hue's statement about being in Florida at that time, Detective Cogswell did not believe it was necessary to apply for warrants for the remaining two phone numbers. The Court finds Detective Cogswell's testimony fully credible.

29

The record makes clear that before Detective Cogswell received the -6223 phone number from the South Carolina detectives, it was an investigative priority to contact Mr. Hue, he had obtained three possible phone numbers for Mr. Hue, including the -6223 phone number, he considered Mr. Hue to be a suspect in Ms. Ryals's homicide, and it was his routine practice to develop phone records for suspects in every homicide investigation that he worked on. "Concluding that discovery was inevitable here requires no tenuous 'string of conjecture,'" and the Court readily concludes that this factor is satisfied. *Alston*, 941 F.3d at 139 (quoting *United States v. Thomas*, 955 F.2d 207, 209–10 (4th Cir. 1992)) (holding that "even absent [the defendant's unlawfully obtained admissions], [the investigator] inevitably would have searched the car and found the gun" because it was "his highest priority in conducting the traffic stop . . . to find the gun he believed to be in the car and to get it off the street."); *see also, e.g., United States v. Burney*, No. 2:22cr91, 2023 WL 4834951, at \*6 (S.D. W. Va. July 27, 2023) (finding that the detective would have lawfully discovered the evidence and stating that "[t]his determination requires no conjecture because [the detective] testified directly to the point" and "[t]he court finds this testimony credible.").

\*     \*     \*

In sum, Detective Cogswell could have lawfully applied for the March 12, 2017 T-Mobile Search Warrant absent the unlawfully obtained information derived from the 2017 Traffic Stop, and he would have done so in the course of his routine

investigative practice. Therefore, any evidence obtained from the March 12, 2017 T-Mobile Search Warrant is also admissible under the inevitable discovery doctrine.

## B.        The 2023 and 2024 Social Media Search Warrants

Second, the Government seeks to introduce evidence from: (1) the June 29, 2023 Facebook search warrant for records related to seven accounts; (2) the December 7, 2023 Google search warrant for records related to ten accounts; and (3) the January 19, 2024 Google search warrant for records related to ten accounts.[13] Gov't Resp. at 11–16. These warrants were sought and obtained by federal investigators, after Mr. Steeps's DNA match prompted the transfer of this investigation to the FBI. *Id.* at 11.

The Government submits that the affidavits submitted in support of these warrants were exhaustive, "containing much information from unchallenged sources while briefly referencing information from or arguably derived from the 2017 traffic stop."[14] *Id.* at 12. It represents that the probable cause section of the affidavit

---

[13] As noted *supra*, the Government will not introduce evidence from the June 29, 2023 search warrant for records related to Ms. Chen's Facebook account ending in -20072 or from the December 7, 2023 search warrant for records related to AntwanHue@gmail.com and Regina.chen89@gmail.com. *See* Attachment A.

[14] The Government submits that "[b]y the time the FBI adopted the case, the government was aware that *defendant's* property seized during the 2017 traffic stop, including the -6223 phone, could be suppressed. Accordingly, the FBI did not include that information in any of the successive warrant applications at issue in this case. However, the government believed that defendant did not have standing to challenge information on *Regina Chen's* phone, and so a small amount of that information was used in a few affidavit paragraphs that were repeated in [the 2023 and 2024 Social Media Search Warrants.]" Gov't Resp. at 12. The affidavits also included cell-site locational data obtained via the March 12, 2017 T-Mobile Search Warrant. *Id.* At the motion hearing, the Government represented that it would not seek to introduce evidence obtained from Ms. Chen's accounts. *See* Attachment A. Therefore, the Court need not consider Mr. Hue's standing to challenge evidence obtained from Ms. Chen's phone or the admissibility of the accounts belonging to Ms. Chen. However, the Court

submitted in support of each warrant is similar and contains, *inter alia*, the following facts that were *not* derived from the 2017 Traffic Stop:

- Defendant had a previous romantic relationship to Ryals, the murder victim; Defendant had a previous domestic-violence incident against Ryals;

- A Virginia state court ordered defendant to pay child support to Ryals for their child in common;

- Defendant's U.S. passport renewal was declined due to arrearage on these child-support payments;

- Defendant was a dual U.S. and Jamaican citizen;

- Defendant travelled—two days before the murder—from New York City, then to Wilkes-Barre, Pennsylvania, then to Maryland, where Ryals lived;

- Defendant and his then-girlfriend, Bedessie, stayed with T.C. in Maryland;

- There, defendant told [Mr. Chiles] that he was frustrated by having to pay child support, that he thought Ryals enjoyed having power over him, and that he had spoken with a lawyer who advised him to confront Ryals and convince her to withdraw the child-support order;

- Defendant had made similar statements to Ryals's mother before the murder;

- The day before the murder, defendant's phone called a Wilkes-Barre-based telephone associated with the girlfriend of Mercer;

- Financial records from the day before the murder showed a nearly $2,000 transfer from Bedessie to an individual who lived less than a quarter mile from Mercer in Wilkes-Barre;

---

provides this context to explain that the affidavits submitted in support of the 2023 and 2024 Social Media Search Warrants, by in large, did not rely on evidence obtained from the 2017 Traffic Stop, with the exception of some evidence obtained from Ms. Chen's phone.

- Ryals was murdered inside her home by three then-unknown individuals in front of her minor child;

- Defendant was released from his child-support order after Ryals's mother took custody of the minor child and, in October 2018, defendant renewed his U.S. passport;

- In June 2019, a DNA hit linked Zquan Steeps, of Wilkes-Barre, to the murder scene, though state authorities ultimately dismissed the murder charges against him;

- In August 2019, federal agents arrested defendant in Miami on drug charges after the agents tracked two of his drug mules. The mules had disembarked from a Jamaica-to-Miami cruise with defendant's cocaine, and the agents arrested him when he went to pick up the drugs from them. He told the agents he had met the mules in Pennsylvania;

- In March 2022, additional evidence from a cooperating witness further linked Steeps and Mercer to the murder and Wilkes-Barre; and

- The affidavit explained in detail why the target usernames were related to the murder investigation.

*Id.* at 13–14.[15]

Based on the above, the Government argues that any information derived from the 2017 Traffic Stop was immaterial to the decision to seek the 2023 and 2024 Social Media Warrants, and any reasonable magistrate judge would have granted the warrants absent reference to any unlawfully obtained information. *Id.* at 14. Accordingly, the Government argues that the evidence derived from these warrants is admissible under the attenuation and inevitable discovery doctrines. *Id.* Defendant maintains

---

[15] *See* App. & Aff., *United States v. SEALED*, No. 2:23sw123 (E.D. Va. June 29, 2023), ECF No. 5; App. & Aff., *United States v. SEALED*, No. 2:23sw213 (E.D. Va. Dec. 7, 2023), ECF No. 3; App. & Aff., *United States v. SEALED*, No. 2:24sw8 (E.D. Va. Jan. 19, 2024), ECF. No. 3.

that any evidence derived from these warrants should be suppressed as fruit of the unlawful 2017 Traffic Stop because the warrant affidavits presented facts supporting probable cause "by referencing WhatsApp messages from [Ms.] Chen's phone, which was seized during the 2017 traffic stop." Def. Mem. at 21–23. For the following reasons, the Court finds that the evidence is admissible under both doctrines.

### 1. Attenuation

Under the attenuation doctrine, the Government must show that the "taint" of the unlawful search has been sufficiently dissipated. In evaluating attenuation, the Court considers: "(1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Gaines*, 668 F.3d at 173 (citing *Brown*, 422 U.S. at 603–04).

Here, more than six years passed between the unlawful 2017 Traffic Stop and the FBI's application for the 2023 and 2024 Social Media Search Warrants, which weighs heavily in favor of attenuation. As to the presence of intervening circumstances, the Norfolk investigators began looking into Mr. Hue as a suspect in Ms. Ryals's homicide in early 2017. After the 2017 Traffic Stop—and the subsequent suppression of evidence derived from that stop in South Carolina state court—the Norfolk investigation of the Ryals homicide stalled. The investigation resumed approximately two years later, in 2019, after investigators received a DNA hit on Mr. Steeps—which was wholly unrelated to the 2017 Traffic Stop. Following this development, the Ryals homicide investigation was transferred to the FBI, which later

34

applied for the 2023 and 2024 Social Media Search Warrants at issue. The Court readily finds the presence of intervening circumstances. Finally, there is no apparent connection between the unlawful 2017 Traffic Stop and the FBI's later decision to seek the challenged warrants. Indeed, each warrant lists sufficient facts for probable cause, independent of any information derived from the unlawfully obtained phone extractions. Moreover, Officer Campbell, the South Carolina police officer who conducted the 2017 Traffic Stop, did not know Mr. Hue was a suspect in Ms. Ryals's homicide when he conducted that traffic stop. As such, there is absolutely no indication that the prior misconduct was, in any way, purposeful in relation to the evidence at issue. *Cf. Brown*, 422 U.S. at 605 ("The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or 'for questioning.' The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up." (internal citations omitted)).

Therefore, the Court easily concludes that any taint from the 2017 Traffic Stop had dissipated by the time the FBI sought the 2023 and 2024 Social Media Search Warrants. Accordingly, evidence derived from such warrants is admissible under the attenuation doctrine.

35

### 2.    *Inevitable Discovery*

The Government also argues that evidence derived from the 2023 and 2024 Social Media Search Warrants is admissible pursuant to the inevitable discovery doctrine. Under that doctrine, the Government must show that (1) investigators could have obtained the evidence from lawful means; and (2) investigators would have done so. *Alston*, 941 F.3d at 139 (quoting *Nix*, 467 U.S. at 444).

The Court easily finds that both elements are met. First, the probable cause statements listed above, which were not derived from the unlawful 2017 Traffic Stop, are more than sufficient to establish probable cause. Any reasonable magistrate judge would approve the warrants at issue based on those statements. Second, considering the importance of this evidence to the federal investigation, and the attenuation from the unlawful stop as discussed above, the Court readily concludes that the FBI would have applied for these warrants absent the unlawful 2017 Traffic Stop. Accordingly, the evidence derived from the 2023 and 2024 Social Media Warrants is also admissible under the inevitable discovery doctrine.[16]

---

[16] The Government additionally argues that Mr. Hue lacks standing to challenge these warrants, because none of the target email addresses or social media accounts belong to him—other than one email address that the Government does not seek to utilize. Gov't Resp. at 16; Attachment A (indicating that the Government will not introduce "[e]vidence from the December 7, 2023 search warrant (2:23sw213) for records related to AntwanHue@gmail.com."). The Government cites *United States v. Taylor*, 857 F.2d 210, 214 (4th Cir. 1998) in support of its argument. The Court has reviewed *Taylor* and finds no support therein for the Government's position. In *Taylor*, the Fourth Circuit stated that "Fourth Amendment rights are . . . personal rights." *Id.* (citing *Brown v. United States*, 411 U.S. 223, 230 (1973)). However, in so stating, the Fourth Circuit only addressed a defendant's standing to litigate the *search* of another individual and did not speak to a defendant's standing to litigate the *suppression of evidence belonging to another person*, found subsequent to an

### C.    Witness Statements and Subpoenas

Finally, Mr. Hue broadly challenges the admissibility of evidence obtained from subpoenas issued in this case and statements made by potential witnesses, including co-defendants, arguing that the Government has a *Brady*[17] obligation to identify any such subpoenas or witness statements that were obtained based on illegally obtained information. Def. Mem. at 23–25. The Government is **ORDERED** to file a notice on the docket on or before April 20, 2026[18] indicating whether any potential taint from the unlawful 2017 Traffic Stop exists with respect to subpoenas, interviews, debriefs, or witness statements obtained during the investigation of this case.

## V.    CONCLUSION

For the foregoing reasons, the Motion (ECF No. 110) is **DENIED as moot in part** and **DENIED in part**. The Motion is **DENIED as moot** with respect to the evidence that the Government submits it will not introduce in its case in chief at trial, *see* Attachment A, and **DENIED** with respect to the March 12, 2017 T-Mobile Search Warrant and the 2023 and 2024 Social Media Search Warrants. Further, the Government is **ORDERED** to file a notice on the docket on or before April 20, 2026 indicating whether any potential taint from the unlawful 2017 Traffic Stop exists with

---

unlawful search of the defendant's own vehicle. *See generally id.* Nor has the Court identified authority suggesting that, beyond the standing requirement to challenge the constitutionality of a search, defendants must satisfy a separate standing requirement to contest individual pieces of evidence derived from that unlawful search. However, the Court need not, and does not, reach this issue, because it finds that the challenged evidence is admissible for the reasons stated herein.

[17] *Brady v. Maryland*, 373 U.S. 83 (1963).

[18] At the January 20, 2026 motion hearing, the Court ordered the Government to file such a notice within 90 days of the hearing. Min. Entry, ECF No. 237.

respect to subpoenas, interviews, debriefs, or witness statements obtained during the investigation of this case. The Clerk is **DIRECTED** to send a copy of this Order to all counsel of record.

       **IT IS SO ORDERED.**

/s/

Arenda L. Wright Allen

United States District Judge

March 16, 2026

Norfolk, Virginia